## MINNESOTA LOAN & TRUST COMPANY v. BESSIE P. DOUGLAS.[1]

January 26, 1917.

Nos. 20,044—(191).

**Will — royalties from mineral leases — trust for accumulation invalid.**

The manifest intention of the testator, by his will, was to create a trust for the purpose of amassing a large estate, mainly from the accumulation of royalties derived under leases of his land containing rich ore deposits; which estate should not be distributed until 20 years after the death of the survivor of six named persons living at the date of the will. While the trust was being administered, the will provided for the yearly payment of certain sums to his wife, his daughter and each of her three minor children out of the income from invested royalties. It is *held*:

(1) Royalties received by the lessor under mineral leases constitute rents and profits of land, following State v. Evans, 99 Minn. 220; Boeing v. Owsley, 122 Minn. 190; and State v. Royal Mineral Assn. 132 Minn. 232.

(2) Although the lease, under which one of the mines was worked, provided that the lessors should receive at stated intervals each year "as in the nature of royalty * * * 40% of the net profits" of the mine, the income so derived by the lessors is rent and profits from land.

(3) No distinction can be made in respect to the character of royalties between mines opened and worked at the date of the will and mines not worked but which had been explored, the quality and extent of the ore ascertained, and leases made by the testator under which ground rent was to be paid whether ore was mined or not, and if mined royalties— payment of the latter during any year to discharge the ground rent *pro tanto* for such year.

(4) A trust created under subdivision 6 of section 6710, G. S. 1913, insofar, at least, as the trust fund is to be derived from accumulations from realty rents and profits offends against sections 6687 and 6688, G. S. 1913, forbidding such accumulations except during the minority of the beneficiaries, to which last-named sections any trust created under subdivision 6 should be held subject. Whether accumulation of income from personalty is permitted under said subdivision is not

[1] Reported in 161 N. W. 158.

necessary to decide, since, when the trust fails as to royalties and rents and profits from the realty, it is impossible to carry out the scheme testator intended by the trust.

(5) The trust cannot be carried out during the minority of the grandchildren for they are not the real beneficiaries of the accumulations from the rents and profits or royalties and, therefore, the trust is not one to be sustained for a limited time under sections 6687 and 6688, G. S. 1913.

The Minnesota Loan & Trust Company, as executor of the last will and testament of Curtis H. Pettit, deceased, petitioned the probate court for Hennepin county for the allowance of its final account of its administration, and for the assignment of the residue of the estate to the persons entitled thereto. Bessie P. Douglas, the daughter of decedent, filed objections to the assignment of the estate to the Minnesota Loan & Trust Company, as trustee under said last will and testament, on the ground that the attempted gifts, devises and bequests of the estate of said testator to said trustee in trust under said will were contrary to law and void; that the consent of the widow having been withdrawn, her withdrawal of one-third of the estate so changed the expressed intention of the testator as to render the whole will void; and that the ultimate limitation of the remainder of the *corpus* of the estate was invalid and thereby rendered the will wholly void. The probate court, Dahl, J., made findings and decreed that the widow of deceased was entitled to one-third of the personal property remaining and to an undivided one-third of the real estate and that the daughter of deceased was entitled to two-thirds of the personal property remaining to be distributed and to an undivided two-thirds of the real estate. The Minnesota Loan & Trust Company, as executor and as trustee and testamentary guardian, appealed to the district court for that county from that part of the decree finding that the provisions of the will and the codicils were void and inoperative under the laws of Minnesota, and distributing the estate as above stated. The appeal was heard before Steele, J., who made findings affirming the decree of the probate court. From the judgment entered pursuant to the order for

judgment, the Minnesota Loan & Trust Company, as executor, appealed. Affirmed.

*Cobb, Wheelwright & Dille, J. M. Martin* and *Charles M. Start,* for appellant.

*James E. O'Brien* and *Carleton & Carleton,* for respondent.

HOLT, J.

Curtis H. Pettit in January, 1908, made his will. After making some minor bequests, of no importance here, he devised and bequeathed all the rest of his property to the Minnesota Loan and Trust Company of Minneapolis in trust to hold, manage, control and dispose of, together with the income therefrom arising, for the uses and purposes and with and subject to the powers and provisions therein declared. He died May 11, 1914, leaving surviving his widow, one child, Mrs. Bessie P. Douglas, and her three minor children as his only heirs at law. At the time of the execution of the will, and the codicils appended thereto, Mr. Pettit was a man of large means. Besides an extensive homestead site, practically within the business district of the city, he owned other tracts of valuable property therein, all of which were appraised in the probate court at $232,000. He owned railroad stocks producing an annual income of $5,600; also shares of other corporate stock which are now worth upwards of $100,000, but which so far have not yielded any dividends. The most valuable parts of his possessions, from an income standpoint, were lands in the northern part of the state containing iron ore deposits. Three tracts therefrom had been leased when the will was made. Upon one of these tracts a mine, designated as the Corsica, had been in operation for a short time, and his receipts therefrom in 1907 had been over $8,000, and the next year they were over $44,000. Mr. Pettit's average yearly receipts from this mine since 1907 have been over $33,000, or $273,000 while he was living. The other two leases covered iron ore lands designated as the Chemung and Tioga mines; but no mines have been worked thereon; however, the lessees were paying him a minimum yearly ground rent of $5,000 on the one, and $3,000 on the other, whether ore was mined or not. When ore is taken out, certain royalties are to be paid, the payment of which discharges *pro tanto* each year the ground rent. The two leases last mentioned run for 50 years, the one

from 1903, and the other from 1906. The Corsica lease runs for 30 years from 1897. As to the amounts involved from the known minerals it may be said that the Pettit estate will receive over half a million dollars from the Corsica mine, in addition to what has been already received from it. The Chemung is estimated to produce at least 8,000,000 tons of ore, which, at the stipulated royalty, would give the estate one million dollars, and from the Tioga is expected 2,000,000 tons, which would add $200,000 in royalties.

The great length of the will and codicils, covering 24 pages of the printed record, precludes us from here giving the same *in extenso*. Therefore we shall attempt to give abbreviated statements of only such parts thereof as bear upon the questions presented for determination. The trustee is directed by the will to pay to testator's wife during her life, for her use, one-half of the net income of the estate, the other half is to be held, accumulated and invested as part of the principal; and he defines "income" to include all royalties as well as all dividends, rents and other income derived from the estate, less taxes and expenses. After his wife's death, the one-half of the income is to be paid to his daughter, Mrs. Douglas, during her life, and the other half held in trust for the benefit of her children; but "net income," as applied to the daughter, shall not be construed to include royalties from mines, unless the income from other sources, going to the daughter, falls short of $12,000 for any year, in which case sufficient from the royalties may be taken to make up said sum. And, if the daughter desires, $2,000 shall be paid yearly to her for each child, and out of the income set aside for the children. When any one of the daughter's children arrives at the age of 25 years, the same shall be paid its share of the net income set aside for it. Royalties in the case of the daughter's children shall not be set aside to them, or be construed to be part of the net income for that purpose, but such income shall be invested and loaned, and the income from such invested sums shall be taken as net income for the purposes of distributing the same to the daughter's children. Upon the decease of both wife and daughter the net income of his entire estate shall be paid to the daughter's children and their heirs by representation, but again the net income shall not include royalties—only

the income from the royalties invested. Upon the decease of his wife, daughter, son-in-law and the three children of the daughter in existence at the date of the will, and 20 years after the death of the last survivor of said six persons, the trustee shall distribute the estate to the children of the daughter's children, or their heirs if any; if none exists then to the nephews and nieces of testator and wife, if any are living, or to their descendants. There is also a provision under which the ultimate distributees, if they should so desire, might form a corporation to take over the estate. After reciting that he held large tracts of land in Lake, St. Louis and Itasca counties of known and believed mineral value, which he had carefully preserved and protected, the trustee is directed to pursue the same policy and not to sell such lands during the lives of his daughter and her daughter Deborah; but the timber from such lands may be sold and mining options granted, and leases or licenses given for the removal of iron ore or other minerals and stone, upon such terms as the trustee may determine. The railroad stocks, except such portion as might be indispensably necessary to sell to pay debts, the trustee is enjoined to retain as an investment. The Minneapolis real estate the trustee is also directed not to sell during the lives of the daughter and said granddaughter, Deborah, but to lease the same, the lessees not to receive options to purchase the ground leased. The first codicil corrected an error in the will so that the income going to a grandchild could, during the lifetime of the mother, be received by such child upon reaching the age of 25 years, but it also imposed a further restriction by the provision that such payments were to come out of "the net income on its proportionate share of the said one-half of the net income of my estate so being held by my said trustee for the benefit of my said daughter's children." The third codicil deals with the receipts from the Corsica mine, and provides that no part therefrom should go to his wife but all thereof, accumulated during the life of his wife, should be invested as principal of the trust estate and such receipts should not be construed as royalties or other income to be paid directly to any of the beneficiaries of the will, but should be invested and only the net income of such investments to be paid from time to time to the persons, and in the manner specified in the will.

The widow elected to take under the statute, though her formal con-

135 M—27

sent to abide by the will was appended thereto and to the codicils.   Her right to such election was sustained in State v. Probate Court of Hennepin County, 129 Minn. 442, 152 N. W. 845, L.R.A. 1915 E, 815.

Testator's daughter, Bessie P. Douglas, filed objections in the probate court to the assignment of the estate to the trustee on the ground that the will was in violation of law and void.   The objections were sustained, and· a decree entered vesting an undivided two-thirds interest in the daughter.   Upon appeal to the district court, the action of the probate court was affirmed, and this appeal resulted.

The will and codicils are couched in language so clear and precise that there is no room for construction.   The testator's intention with respect to his property stands out distinctly, and should be carried out unless insuperable legal obstacles prevent.   The legal objections urged by respondent in this court are:   (1) The central purpose and plan of the trust is to produce a fund for investment through a direction for an invalid accumulation of the rents and profits of real estate; (2) the direction to the trustee for the final distribution of the estate constitutes, in effect, a future estate by way of remainder, so limited that it cannot vest in interest within two lives in being at testator's death; (3) the trust provisions suspend the power of alienation of the real estate covered for more than two lives in being, and the free alienation by the trustee of the legal estate is suspended beyond two lives; and (4) the will creates a trust term which must in any event continue for six specified lives in being and 20 years thereafter, and which may, because of the imperative directions given the trustee, continue during a life or lives not in being at testator's· death.

Since we have arrived at the conclusion that the first objection stated is decisive of·the appeal, ·and leads to an affirmance of the judgment, we shall not consider or discuss the other three objections urged against the validity of the trust.

It is plain that the scheme and plan of testator was to accumulate a large fund in the hands of the trustee for distribution to the unborn heirs of his daughter's children, and, while this was being done, to amply provide for the needs of his wife, daughter and grandchildren. It is also clear that the source most relied on by him to create the large fund finally to be distributed, was his ore-bearing lands in the northern

part of the state.   As royalties, rents and profits therefrom were received, the same, with trifling exceptions, must go to swell the fund, and only the income from such income was to be received by the beneficiaries in the will, prior to the final distribution in the distant future.

The first proposition to be determined is the character of royalties, or the income derived from mining leases given and to be given upon these lands.   The contention of appellant is that these are not rents and profits from real estate, but constitute capital, or land converted into personalty, because as the ore is mined the value of the land is proportionately and permanently depreciated.   The respondent maintains that by the decisions in State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520; Boeing v. Owsley, 122 Minn. 190, 142 N. W. 129, and State v. Royal Min. Assn. 132 Minn. 232, 156 N. W. 128, it is now settled law in this state that royalties under mining leases constitute rents and profits from land.   The importance of the question, as met in each of the cases mentioned, was fully appreciated by the court and the well-recognized standing and ability of counsel, who represented the parties therein, vouch for the thoroughness with which every argument and point was pressed upon the attention of the court. Of these cases the Boeing case is closely related to the one at bar, since it determined that royalties from mining leases were to be considered as rents and profits from real estate in the distribution and descent of property.   Eminent counsel now urge that the precise question here presented was not involved in any one of the three cases mentioned.   In a certain sense this is true; at the same time the nature of a mining lease, whether it constitutes a sale in place of the ore so as to be a conversion of realty into personalty, or whether it returns to the lessor what is ordinarily termed rent from land, was considered from every angle, and the result reached, in each case, that it was the latter.   That the same arguments, now made as to the distinction to be drawn between rents and royalties, were advanced in the Evans case will be seen from the able manner in which such arguments were answered by Chief Justice Start in that opinion [99 Minn. 226, 108 N. W. 960], viz:

"We have been greatly aided in such consideration by the exhaustive citation and able analysis of the adjudged cases in the briefs of counsel for the respective parties.   The customary method of developing, work-

ing, and obtaining profits from mineral lands, at the time of the adoption of our Constitution, was by means of mineral leases similar to those in question. The removal of ore from the demised land was not deemed waste, but a legal and reasonable way of securing the profits of the land. The lessee for life or years of land was, by the common law, authorized. to operate and take the profits of open mines, although the lease was silent as to mines, but he could not open new mines even when the land was let with the mines; if, however, the land was let with the mines, and there were no open mines on the land, the lessee might open new mines and take profits thereof. Coke Littleton, 53b; Clegg v. Rowland, L. R. 2 Eq. 160.

"The conclusion to be drawn from the English cases, as clearly and correctly stated by the learned trial judge, is this: 'That from the very beginning the rights of the man who owned the land, and of the man who took away the minerals from it, were worked out through the law of tenancy, without the aid of the law of sales. That it was never a conception of the law that the man who took away the mineral got his title through a sale by the owner of the land; but the theory was that the mineral was the product of the use for which rent was paid, and that the tenant got his title to his mineral by an appropriate use of the demised premises. That it was never a circumstance of significance that the use of the demised premises, in accordance with the intent of the parties and in accordance with the nature of the use to which they could be put, resulted in the gradual consumption or even exhaustion of the portion of the land of chief worth.'

"A consideration of the cases in this country leads to a like conclusion. The propriety of a lease for the purpose of developing and working mines is recognized by all of the cases, and the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land, and, further, that iron or other materials derived from the usual operation of open mines or quarries, constitute the rents and profits of the land, and belong to the tenant for life or years, and to the mortgagor after sale on foreclosure and before the expiration of the time for redemption. The rule, however, has no application to

unopened mines in the absence of a contract, express or implied, for opening and leasing them."

Even did we feel not concluded by the opinions mentioned, fortified as they are by abundant authorities therein cited, we should not be inclined to view these leases as legitimate means by which, under existing trust statutes, vast fortunes might be amassed and hoarded for future generations. We, therefore, hold that royalties or incomes derived from mining leases, whenever found or attempted to be made use of in the creation of trusts, are rents and profits of real estate. That the testator did not consider them such can be of no consequence. The law must determine their character, and it had so done in the Evans case when this will was made. The case of Von Baumbach v. Sargent Land Co. 219 Fed. 31, 134 C. C. A. 649, much relied on by appellant, was on January 15, 1917, reversed by the Supreme Court of the United States (242 U. S. 503, 37 Sup. Ct. 201, 61 L. ed.——), the court citing with approval our cases before mentioned to the effect that royalties from mining leases are not sales of ore in place, but income from business subject to the income tax.

It is, however, claimed that the agreement under which the Corsica mine is operated is not a lease but a contract under which the landowners and the mining company are in a sort of partnership. It is true that, instead of the usual royalties, the lease prescribes the mode in which the mine is to be worked; and, among other things, limits the salary of the superintendents to $5,000 per annum; provides that no salary should be received by any other officer of the company, and otherwise attempts to control the operating expenses. The company is to proceed at once to mine and conduct the mining systematically and constantly; it is to furnish all necessary machinery and equipment, and it can charge against the gross earnings not to exceed 20 per cent in any one year for such equipment of the plant, and, when paid for, the lessor is to own an undivided interest therein. Certain other charges can also be made against the gross earnings. The owners of the land are to receive at stated intervals each year, "as in the nature of royalty 40% of the net profits." We are of opinion that this manner of paying for the privilege of mining is not essentially different from paying a certain amount for each ton taken out, and the amounts

received under the agreement should be held to be rents and profits from the land. The arrangement under which a fund had been acquired in a mining operation in California, and the facts which controlled the right to such fund in the case of Hudepohl v. Liberty Hill Con. Min. Co. 80 Cal. 553, 22 Pac. 339, cited by appellant, are not sufficiently analogous to the provisions of the Corsica lease to be of much weight here.

It is also said that the Chemung and Tioga mines, not yet having been opened or worked, the royalties to be obtained therefrom cannot be considered rents and profits. Of course, if they are not opened, the ground rents now collected are clearly rents and profits issuing from land. But we assume that they will be opened in the future. They had been explored and the ore, its extent, value and location ascertained when the will was made. It must also be noted that testator conferred express authority upon the trustee to lease, upon royalties, any of the lands wherein ore deposits might be discovered during the duration of the trust; and that the leases now existing might be forfeited and new leases made by the trustee. In fact, part of the duties of the trustee is to see that the supposed ore-bearing lands be explored, and, if merchantable ore be discovered in paying quantities, that it be mined and royalties obtained. In that situation no valid distinction can be made between opened and unopened mines, so far as concerns the royalties to be received under this trust. The purpose of the testator was to have all the leased mines opened and worked. We think the Evans case also determines this point against appellant, for here we have existing leases under which known ore deposits are to be mined, and express direction to the trustee to cause discovered mines to be let for royalties. The court in that case [99 Minn. 228, 108 N. W. 961] says: "If, then, the state may explore its lands, and, when iron ore is found thereon, open the mines, and then lease them, the distinction between open and unopen mines would seem to be immaterial, so far as the question of the constitutionality of this mineral lease statute is concerned." In Koen v. Bartlett, 41 W. Va. 559, 23 S. E. 664, 31 L.R.A. 128, 56 Am. St. 884, it is said that a mine leased to be opened is an open mine. There seems no question about the existence of mineable, merchantable ore in both Chemung and Tioga mines. The authorities cited by appellant

on the definition of unopened mines we do not regard as controlling. Traer v. Fowler, 144 Fed. 810, 75 C. C. A. 540, related to royalty from an open mine, and the court held these to be rents and profits from real estate. A reference is therein made to the rule in respect to ore in place where no mine is opened, but there is nothing said which would apply the rule to a case of a known ore deposit where the owner of the land leases the same for the purpose of mining upon royalties. In McFadden's Estate, 224 Pa. St. 443, 73 Atl. 927, the testator devised the residue of his property to a trustee to pay the net income to his wife for life and the principal over with no power of sale. The trustee gave a mining lease. It was held that the royalties were principal and not income, on the theory that there were no open mines on the property. Pennsylvania decisions as a rule are at variance with the doctrine of the Evans case; and, furthermore, it does not appear in the McFadden case that the testator either leased or gave direction to the trustee to lease the land for mining purposes. The only authority outside Pennsylvania, to which our attention has been called, squarely supporting appellant that the Chemung and Tioga should be held unopened mines, in the restricted sense so that the money derived from a lease thereof should not be considered as rents and profits from real estate, is Palms v. Palms, 68 Mich. 371, 36 N. W. 419. Even in Pennsylvania mineral leases are not always held to be a sale of ore in place. Denniston v. Haddock, 200 Pa. St. 426, 50 Atl. 197, and other authorities cited in State v. Royal Min. Assn. supra.

The next proposition is whether a trust created under subdivision 6 of section 6710, G. S. 1913, evidently the statute under which the trust in this will was attempted to be created, is in any manner limited by sections 6687 and 6688, G. S. 1913, prohibiting an accumulation of rents and profits of real estate except for the benefit of minors during their minority. Subdivision 6 reads:

"For the beneficial interests of any person or persons, whether such trust embraces real or personal property or both, when the trust is fully expressed and clearly defined on the face of the instrument creating it: Provided, that the trust shall not continue for a period longer than the life or lives of specified persons in being at the time of its creation, and for twenty-one years after the death of the survivor of them, and that the

free alienation of the legal estate by the trustee is not suspended for a period exceeding the limit prescribed in chapter 59."

Respondent contends that, since all trusts permitted under the common law have been abolished in this state both as to realty and personalty (Shanahan v. Kelly, 88 Minn. 202, 211, 92 N. W. 948; Young Men's Christian Assn. of Minneapolis v. Horn, 120 Minn. 404, 407, 139 N. W. 806), such only as our statutes expressly authorize can now be created, and that the one here attempted is not so authorized even as to personalty. The argument proceeds substantially thus: In considering the effect of subdivision 5 of said section 6710 this court in the case last mentioned uses this language: "Did it merely restore the common law as to trusts in personalty, with, among other things, its limitations against perpetuities and likewise its exceptions to and qualifications upon such limitations? We cannot think that such was the intention of the legislature, for this would be to restore *pro tanto* the evils against which the trust statute was directed, and likewise the uncertainty and confusion which had long since become symbolized by the term 'common law rule against perpetuities'" [p. 411.] And although the conclusion was reached that section 5 permitted a perpetual trust not at all, however, governed by the common-law rule against perpetuities, this was said with reference to accumulations: "By its terms, however, subdivision 5, though seemingly broad at the first glance, should never be invoked as authorizing accumulations." [p. 415] If this was properly asserted as to subdivision 5, respondent contends that it should also be held that subdivision 6 does not authorize any accumulations, since by its express provisions trusts created thereunder may embrace realties and the incomes therefrom in the way of rents and profits, and this has since early times been obnoxious to our law. There is force in respondent's position; but we deem it unnecessary to now determine whether a trust directing accumulations of the incomes from personalty can be created under our statutes, for, no doubt, the main purpose in attempting the trust here was to amass a fund from the accumulations produced by the royalties mentioned, and, if that must fail, it is unreasonable to suppose that any desire remained on the part of the testator to have the trust carried into effect as to the comparatively small amount of personal property available. In fact the widow's election to

take her one-third has so depleted the personalty that it is impossible to derive from its income sufficient to pay the daughter's annual maintenance of $12,000. So that, with the accumulations from rents and profits from realties taken from out of the trust, there is no longer any hope of carrying into effect the testator's wishes and directions as to the immediate beneficiaries of his thoughtfulness—his daughter and her children.

Appellant earnestly contends that subdivision 6 of said section 6710, being a part of chapter 60 on Uses and Trusts, is not restricted or limited by said sections 6687 and 6688, being part of the preceding chapter 59 on Estates in Real Property. The argument is, that insofar as it was deemed necessary to apply the restrictions of chapter 59 they are found embodied in the proviso of subdivision 6. And also that in subdivisions 3 and 4 of the same section, relating to trusts from rents and profits of land and accumulations thereof, it is specifically stated that the trusts created thereunder are subject to the provisions of chapter 59; hence it is argued no inhibition on the right to create a trust for the accumulations of rents and profits should be held to be contained in subdivision 6; and furthermore this subdivision, having been enacted long after the said sections 6687 and 6688 were in force, is not controlled thereby unless expressly made subject thereto. We think the argument not persuasive. Because subdivision 6 may also embrace trusts in realty, there is more reason for saying that it cannot be invoked to authorize accumulations of rents and profits than for saying that subdivision 5 cannot be so invoked as to personalty, and this was asserted by the late Justice P. E. Brown in the cited quotation from Young Men's Christian Assn. v. Horn, supra. Furthermore, to read subdivision 6 so as to authorize the accumulations contended for, we must find that there was a deliberate intention to abrogate the salutary provisions named in chapter 59, and virtually open the door to all manner of express private trusts, entirely unhampered except by the proviso therein. We do not for a moment believe such intention is to be found in the subdivision, nor does the language used convey such meaning, when it is remembered that a statute prohibiting accumulations of rents and profits from realty was in existence, and had so been from early times in the history of this state. The evils resulting from private trusts for the accumula-

tions of rents and profits from land have been for so long recognized and understood that no legislature should be charged with an intention to revive the same. We therefore hold that, at least as to rents and profits from real estate, no trust may be created, except subject to the restrictions contained in chapter 59. The suggestion is made that if the state may accumulate royalties derived from leases of its mineral land, the same privilege should be enjoyed by its citizens. The cases are not parallel. True, the state holds these lands in trust, but the trust is for a public purpose. The fund to be accumulated therefrom is for the education of its citizens. The state is more than a mere naked trustee. It has a vital interest in the purposes of the trust and is to a large extent a beneficiary. This may not be said of private trusts.

It is also asserted on this branch of the case that, even if the attempted trust offends the statute against the accumulations of rents and profits, it should be sustained until the children of respondent attain majority under the provisions of that statute. The difficulty with this proposition is that these children, under the scheme of the trust, are not and will not be the beneficiaries of the rents and profits. Pray v. Hegeman, 92 N. Y. 508. They are only to receive part of the income arising from the investments of the rents and profits. The trust accumulations attempted are not of the sort permitted under any view of our statute.

In arriving at the conclusion that the trust created by this will offends against the laws of this state to such an extent that it must wholly fail, we have not been unmindful of the rule, so often stated by courts, that a person's property is his own and he may do with it what he will. He may control and direct its use and disposition for any length of time after he has returned to dust, provided the law permits. But it is equally true that it is competent for the state to limit his right to control the property he is compelled to leave within the dominion of the state when he dies. The descent of the property may be controlled by statute. And when his intention in respect to such property, whether manifested by trust deed or by will creating a trust, runs counter to these laws, the latter must prevail.

The judgment is affirmed.