*In re* RUST'S ESTATE.

TAXATION—INHERITANCE TAX LAW—WILLS—MINING LEASE—IN-
TEREST IN REAL PROPERTY—EXEMPTIONS.

An agreement to lease certain lands for a term of 50 years
and three months to a mining corporation, "together with
all the mining rights, interests, and estate of the lessors,
and of each of them, in, of and to all of the said lands
and premises," and providing that lessee is to pay a cer-
tain sum per ton as royalty on all iron ore mined, and
giving it the option of terminating same by giving 30 days'
notice, and also providing that if lessee fails to perform
lessors may take possession, is a lease rather than a con-
tract for the sale of said ore, and the interest of the widow
and adopted daughter under the will of one of the lessors
giving to trustees for their benefit all of his right, title,
and interest in and to said lands and said mining lease,
is an interest in real estate, and as such exempt from
taxation under the provisions of the inheritance tax law
(3 Comp. Laws 1915, § 14525).

Error to Saginaw; Snow (Ernest A.), J. Submitted
October 15, 1920. (Docket No. 29.) Decided March
30, 1921.

Petition by George L. Hauser, deputy auditor gen-
eral, against the estate of Ezra Rust, deceased, for a
determination of an inheritance tax. There was an
order denying the petition, and plaintiff appealed to
the circuit court. Judgment for defendant. Plaintiff
brings error. Affirmed.

*Alex. J. Groesbeck*, Attorney General, and *Duane H.
Mosier*, Assistant Attorney General (*Leland W. Carr*,
of counsel), for appellant.

*Weadock & Weadock* and *Cavanaugh & Burke*
(*George W. Weadock* and *M. J. Cavanaugh*, of coun-
sel), for appellee.

MOORE, J.   Ezra Rust, a resident of Michigan, died in January, 1918, leaving a large estate.   He made a will, leaving to his widow and his adopted daughter a large amount of property.   This proceeding was instituted on the petition of the auditor general of the State to collect an inheritance tax to which it is claimed the State is entitled because of the provisions of the will.   The probate court held against the contention of the State, and the case was appealed to the circuit court, where after trial a verdict was directed in favor of the estate.   Judgment was entered, and the case is here by writ of error.

The facts were stipulated.   So far as it is necessary to state them they are as follows: Mr. Rust was the owner in fee of a one-half interest in lands in Minnesota, valuable because of the mineral contained therein, and he was the owner of one-third of the mineral contained in said land.   At the time of the death of Mr. Rust it is conceded that his interest in this property, after making proper deductions, was appraised at upwards of $1,800,000.   The State of Minnesota collected an inheritance tax of the estate.   In the lifetime of Mr. Rust a paper was drawn reading in part as follows:

"This indenture made this second day of October, A. D. 1899, between George L. Burrows (widower) of Saginaw, in the State of Michigan, Ezra Rust and Emma B. Rust, his wife, of the city of New York, in the State of New York, and Gilbert B. Goff and Emily A. Goff, his wife, of Edenville, in the State of Michigan, hereinafter called the lessors, parties of the first part, and Lake Superior Consolidated Iron Mines, a corporation organized under the laws of the State of New Jersey, hereinafter called the lessee, party of the second part, witnesseth as follows:

"*First:* That the lessors, in consideration of the sum of one dollar to them paid by the lessee, the receipt whereof is hereby acknowledged, and in further consideration of the covenants, conditions and provisions

of this lease to be kept and performed by the lessee, do hereby let, demise and lease, unto the lessee for the term of fifty years and three months from and after the first day of October, in the year one thousand eight hundred and ninety-four, the following described lands and premises in the county of St. Louis and State of Minnesota, to-wit."

Then follows a description of the land.

"Together with all the mining rights, interests and estate of the lessors, and of each of them, in, of and to all of the said lands and premises, subject, nevertheless, to any and all rights of way evidenced by instruments now of record, through, over or across any part of the said land and premises, granted to the Duluth, Missabe & Northern Railway Company, and to the Duluth, Mississippi River & Northern Railroad Company.

"It is agreed by the parties hereto that the rights possessed by the lessee under said instrument shall not be terminated by the making of this lease, but shall continue and shall be the same as if this lease had been in force at the expiration of said instrument.

"The said lands and premises are demised to the lessee for the sole purpose of exploring for, mining, taking out and shipping therefrom the merchantable iron ore (as well as other minerals as hereinafter provided for) which is or hereafter may be found on, in or under the said lands, with the right to the lessee to construct all buildings and to make all excavations, openings, ditches, drains, railroads, wagon roads, and all other improvements which are or may become necessary or suitable for the mining or removing of the iron ore therefrom and the carrying on of mining operations thereon. * * * The term 'merchantable ore' as used in this lease shall be taken to mean such ore as shall be merchantable from time to time as the work of mining progresses.

"*Second:* The lessee hereby covenants and agrees to pay to the lessors a royalty on all iron ore mined and shipped from the said lands while this lease shall remain in force as follows:

"For all iron ore mined and shipped prior to the first day of January, A. D. 1900, the royalty shall be

at the rate of thirty cents for each gross ton, and for all iron ore mined and shipped on or after the first day of January, A. D. 1900, the royalty shall be at the rate of twenty-five cents for each gross ton. As to all iron ore mined and shipped before January 1, 1900, the lessee will pay the royalty to the lessors on or before the 25th day of each month for all ore mined and shipped during the calendar month preceding the first day of the month in which the payment is to be made. As to all iron ores mined and shipped on or after the first day of January, 1900, the royalty shall be due and payable on the tenth days of April, July, October and January in each calendar year (which days are hereinafter called 'quarter days'). The payment on each quarter day shall be for the full amount of ore mined and shipped from the said lands during the three months immediately preceding the first day of the month in which the payment shall become due. The premises above described being under lease from the lessors to the lessee herein under instrument of lease reserving royalty at the rate of thirty cents per gross ton upon an agreed minimum output of twenty thousand tons in each year, and which lease is surrendered simultaneously with the execution and delivery of this instrument, the lessee further covenants that during the year 1899 it will have mined and shipped from the said lands at least twenty thousand gross tons of iron ore, or in case the ore so mined and shipped in the year 1899 shall be less than twenty thousand tons, the lessee will pay to the lessors advance royalty in such sum as shall, together with the amount paid as royalties for ore actually shipped, amount to six thousand dollars.

"The lessee further covenants that in each year during the existence of this lease, after January 1, 1900, it will mine and ship from the said lands at least two hundred thousand gross tons of iron ore as an agreed minimum output, or in case in any one or more of such years the lessee shall not actually ship from the demised premises the full quantity of said agreed minimum output, the lessee will, nevertheless, pay to the lessors advance royalty to be treated and considered as ground rent, in addition to the royalty paid for iron ore actually shipped during that year, such sum as

shall, together with the amount paid as royalty for iron ore, actually shipped during the said year, amounts to fifty thousand dollars.

"Said advance royalties or ground rents shall be paid quarterly at the time and in the manner hereinbefore provided for the payment of royalties for ore actually shipped. * * *

"The obligation of this lease to pay advance royalties as aforesaid shall continue in force without regard to the quantity or quality of iron ore existing on the premises during the full term of this lease or until the same shall be terminated or surrendered or assigned in the manner herein provided; and in case of an assignment of the said lease the obligation to mine or pay for such agreed annual minimum output, as well as all other provisions of the lease, shall bind the assignee as fully as the lessee is bound hereby. * * *

"*Fifth:* The lessee further covenants to pay all taxes and assessments, ordinary and extraordinary, general and specific, which may be levied or assessed upon the lands hereby demised, and on the iron ore mined thereon, and on all improvements and personal property thereon while this lease shall remain in force, and to furnish the lessors with duplicate receipt showing the payment of all such assessments or taxes; provided, however, that the lessee shall always have the right to contest in the courts or otherwise the validity of any such tax or assessment. * * *

"But provided further that the lessee shall not permit or suffer said lands and property or any part thereof to be sold at any time for any taxes or assessments. And upon the termination of this lease, by surrender or otherwise as herein provided, the lessee will peaceably surrender possession of the said lands to the lessors.

"The lessee covenants that while this lease shall remain in force, and until it is surrendered or assigned in manner herein provided it will protect the said lands and the improvements and iron ore in stock piled thereon from all mechanic's or laborer's liens or other liens and keep the title to the same free and clear from all clouds and encumbrances arising from such liens in any way because of its mining operations

thereon, or the use and occupation thereof by the lessee, its agents, servants, employes or contractors.  *   *   *

"The several payments required to be made hereunder shall be made at and to George L. Burrows & Company's bank at Saginaw, Michigan, or at and to any other bank in the city of Saginaw, Michigan, or elsewhere in one of the United States as the lessors, their executors, administrators or assigns may in writing designate, and the bank or banks so designated shall be deemed the agent or agents of the lessors respectively for the purpose of receiving, collecting and receipting for such payments.  *   *   *

"*Seventh:* It is mutually covenanted between the parties, and this lease is granted and accepted upon condition, that the lessee shall have the right at any time, upon thirty days' notice to terminate this agreement and lease, by giving written notice in the manner hereinafter provided to the lessors, their heirs, executors, administrators or assigns, who will in such case acknowledge in writing the receipt of such notice; and this lease shall terminate thirty days after the giving of such notice, whether the same shall be so acknowledged or not.

"All arrearages and sums, including taxes, which shall be due and payable under this lease up to the time of its termination as set forth in the said notice, must and will be paid by the lessee within thirty days after such termination; and the lessee upon such termination must and will forthwith execute and record in the office of the register of deeds of St. Louis county, Minnesota, a formal relinquishment of such lease.  *   *   *

"*Eighth:* This lease is granted and accepted upon condition that if the royalty hereby reserved on the advance royalty or ground rent hereby provided for and agreed to be paid or any part thereof be and remain unpaid after the days and times above specified, and if the same shall remain in default for a period of sixty days, or in case the lessee shall fail to keep any of the covenants or conditions herein expressed to be kept and performed by it, and such failure shall continue for sixty days after the receipt by it of written notice from the lessors specifying the default, neg-

lect and failure complained of, then and from thenceforth and in either of the said events, but not otherwise, it shall be lawful for the lessors, at their option, to terminate this lease and .to take possession of the said leased premises with or without any previous process whatever, to re-enter and have and possess the same as fully as if no lease had been given to the lessee, and the said lessee and all parties claiming under it shall be wholly excluded therefrom, and this lease shall become and be wholly void and at an end subject to the provisions of article ninth hereof; and the lessors reserve and at all times shall have, possession and hold a lien for all unpaid balances due hereunder upon all ore mined upon said premises and upon all improvements made upon the said premises by the lessee. * * *

"*Eleventh:* All covenants, conditions and provisions of this lease shall run with the land and shall inure to the benefit of and be binding upon their heirs, executors, administrators, successors and assigns of the lessors and lessee respectively."

The provisions of the will of Mr. Rust, which are important in this discussion, read:

"I hereby give, devise and bequeath to my wife, Estelle Rust, James G. McPherson and Charles J. Reynick, all of the city of Saginaw, Michigan, as trustees, and to their successors in said trust, all my right, title and interest of every name, nature and description in and to (certain lands which are described), together with all my right, title and interest in and to one certain mining lease thereon, dated October 2, 1899, between George L. Burrows, Ezra Rust and Emma B. Rust, Gilbert B. Goff and Emily A. Goff, and Lake Superior Consolidated Iron Mines, a corporation organized under the laws of the State of New Jersey, and the right to collect, receive and recover all rents, royalties and income thereunder from said Lake Superior Iron Mines, its successors or assigns, together with all minerals, mining rights and mineral interest of every kind, name, nature and description arising or growing out of or connected with said land above described, and the minerals therein, hereinafter for convenience called 'Ezra Rust Mining Property'

to be held in trust, however, during the lives of my said wife, Estelle Rust, and my adopted daughter, Maxine Rust, and the lifetime of the survivor of them hereby giving and granting to said trustees and their successors in said trust full power and authority to carry out the said trust for the following purposes, viz.:

"(1) To do all acts proper in the management and care of said trust property, and to deduct the expenses of said care and management, and their compensation as trustees."

Then follow detailed directions for the execution of the trust.

The provisions of the inheritance tax law of Michigan so far as they are important here may be found in sections 14524 and 14525, 3 Comp. Laws 1915. The last mentioned section exempts the widow, children, adopted children or children to whom the decedent stood in the mutually acknowledged relation of a parent for a certain length of time, from any inheritance tax on real estate.

We cannot state the claim of the State more clearly and concisely than to quote from the brief of counsel, which we do:

"Under the terms of the will the interest of Mr. Rust in and under a certain mining contract was given to his widow and to his adopted daughter. This case involves the question as to whether the transfer of this interest under the will is subject to the inheritance tax law of the State. The contract referred to is set out in full in the record. The basic question at issue here is whether this instrument is a contract for the sale of the ore in place and is in consequence to be regarded as a credit, or is (as claimed by appellees) a lease of land in Minnesota.

"It is the claim of the State that this instrument must for the purposes of this proceeding be construed as providing for the sale of the ore in the lands described, which lands were owned by Mr. Rust and his associates. If this decision is correct it follows that

213—Mich.—10.

the contract must be regarded as a personal property credit within the meaning of the inheritance tax law, as well as within the meaning of the general tax law, of this State. · * * *

"In passing we wish to call attention to the fact that Mr. Rust in his will disposed of the land and also disposed of his 'right, title and interest' in and to this contract. It is evident, therefore, that he regarded the contract as property separate and apart from the land itself. It will be noted also that Mr. Rust bequeathed 'the right to collect, receive and recover all rents, royalties and income thereunder from said Lake Superior Iron Mines.' The use of the term 'rents,' 'royalties' and 'income' suggests that the testator had in mind the payment of rental for the ground by the mining company and also the payments for the ore.

"The parties proceeded under the terms of the contract from the time of the execution thereof up to the present and are now operating under it. At the time of the death of Mr. Rust the estimated gross tonnage of iron ore remaining in the mine was 69,165,662 tons. As appears from the contract Mr. Rust was the owner of one-third of such ore or a quantity in excess of twenty-three million tons. The contract was expressed to continue for fifty years and three months from the date thereof (October 2, 1899). At the time of Mr. Rust's death it had, therefore, a probable future life of approximately thirty years during which the mining company may remove the ore and pay the stipulated royalty per ton. The determination as to the amount that will be paid to the takers of Mr. Rust's interest under the terms of his will and the reduction of that amount to present worth are matters of mathematical computation concerning which no question has been raised.

"We believe it is well settled by the decisions of this court that a mining contract of this character should be interpreted as providing for the sale of the ore. In the case of *Palms* v. *Palms,* 68 Mich. 355, 371, the principal question involved related to the construction of the will of Francis Palms. The court was called upon, however, to determine the nature of royalties re-

ceived under a mining contract similar to the Rust contract.   *   *   *

"It is obvious from a reading of the contract that the parties have used ambiguous and inconsistent phrases. However, we must judge of the real intention, not by chance expressions that may be found, but from an examination of the instrument as an entirety. The recent decision of the appellate court of Indiana in the case of *In re Spurgeon*, 126 N. E. 238, well illustrates the rule referred to. There the parties had entered into a contract which they designated as a lease. By the terms of the instrument the so-called lessees were to pay taxes assessed against the property, keep the property insured, and also pay a specified sum of money on the first day of each month as rental. In case of failure to make payments the party of the first part under the contract was to have the right to take possession of the property. On the completion of the agreement it was agreed that a deed of conveyance of the premises should be made. The question arose as to whether this contract was taxable on the theory that it was in effect a land contract, notwithstanding that an attempt had been made by the parties to execute it in the form of a lease. The appellate court of Indiana determined that it was taxable, saying in substance that the transaction was a sale. The court, among other cases, cited the decision of this court in *City of Marquette* v. *Iron & Land Co.*, 132 Mich. 130. The court also quoted with approval from the earlier Indiana case of *In re Aurora Gaslight, Coal & Coke Co.*, 64 Ind. App. 690 (113 N. E. 1012), where it was said:

"'If the real transaction was a sale of the property and such amounts in truth and in fact represented a balance of purchase money, the character of the transaction cannot be changed by any nomenclature, form or subterfuge employed by the parties, whether innocently or with design, to have the transaction appear to be something other than what it in fact was.'   *   *   *

"The decision in the *Palms Case* has not been overturned and we submit is the law of this State upon this question. We insist that under this decision, and others referred to later on, that royalties received under such a contract do not constitute in any sense

rents and profits of the land, but rather do constitute payment for the ore itself in place; that there is a constructive severance of the ore and separate sale thereof.

"The court in the *Palms Case* compared the mining contract to a contract for the sale of standing timber or a land contract. The latter has been held by this court to be subject to taxation as a credit. In the case of *City of Marquette* v. *Iron & Land Co.*, 132 Mich. 130, the court in its opinion used the following language:

" '1 Comp. Laws, § 3831, subd. 6, makes taxable "all credits of every kind, belonging to inhabitants of this State." Defendant's counsel insists that the obligations in question are not credits. He argues that they should be classed with obligations to pay future rent upon existing leases, obligations to pay salary under contracts for future services, and with obligations to pay for the future delivery of the products of a farm, of a shop, or of a mine. If the obligations in question are indistinguishable from those above instanced, we think that it should be decided that they are not taxable; but in our judgment they are clearly distinguishable. In the instances supposed, the landlord will receive rent for the future use of his own property, the employee will receive wages in payment for his future services, and the farmer, manufacturer, and miner will receive pay for the sale of products which, until the sale is consummated, belong to them. In none of these cases is a credit contemplated. On the other hand by the contracts under consideration (and this is as true of the timber as of the land contracts) the equitable title to the property therein described is at once transferred to the vendee.' * * *

"That the principle announced by the court in the *Palms Case* is the established law of Michigan is shown by the language of Justice OSTRANDER in the case of *Newport Mining Co.* v. *City of Ironwood*, 185 Mich. 668, at page 686, as follows:

" 'Usually the price to be paid would be a fixed price per ton during the continuance of mining operations, or a variable price, depending upon the quantity or selling price, of ore mined and shipped or both. The expense of opening the mine, of conducting mining operations, would be incurred, and if the adventure was successful the owner of the fee would receive, in installments, his royalties, his selling price of the ore.'

"Any possible doubt as to the intention of this court in announcing the rule applied in the *Palms Case* is set at rest by the reference therein to the decisions of the Pennsylvania courts. By a long line of authorities in that State, previous to the *Palms Case,* it was settled that a mining contract of this nature was to be regarded as providing for a sale of the ore; and money paid thereunder was subject to the incidents of the purchase price." (Citing *Caldwell* v. *Fulton,* 31 Pa. St. 475.)

Counsel also cite many other authorities with the idea of supporting their contention. We have examined all of the authorities cited by counsel for appellant and think none of them are controlling.

In *Palms* v. *Palms, supra,* Justice MORSE did express his individual opinion as to the status of royalties, but there is nothing to indicate the other members of the court shared his views in that regard, as the question was not controlling, and Justice MORSE himself expressly reserved the question until its decision was necessary in order to reach a result.

In *City of Marquette* v. *Iron & Land Co., supra,* the court was dealing with the question whether a land contract for the sale of timber could be assessed to the vendor as a credit, and it was held that it could be. Of course in that case the vendee was bound to take and pay for all of the timber sold to him. In the instant case the lessee can terminate the agreement at any time by giving 30 days' notice, which clearly distinguishes the cases.

In *Newport Mining Co.* v. *City of Ironwood, supra,* the question involved was whether the action of the assessing officers was such as to call for the interference of the court. We quote:

"The point we are concerned with is whether a method, wrong in principle, was adopted by the assessing officers in their endeavor to form a judgment as to the present value of the particular land. There is no reasonable ground for contending that the State

may not use the methods of business to ascertain such values. In such a case, it is not compelled to ignore, or discount, the facts of demonstrated availability, quantity, and quality of mineral. If a rule or method exists by which engineers and business men ascertain the values of ore bodies for the purpose of buying and selling them, if no better rule is or can be suggested, how can it be said that the rule is wrong in principle when adopted by the State? The State must, of necessity, treat the peculiar subject of taxation as the subject requires, not to change or modify a cardinal rule of taxation, but to apply it. Upon this record no other rule is suggested, and the rule employed is conceded to be the rule of engineers in like cases. * * *

"There is another consideration affecting the question at issue. The board did not adopt the valuation of the experts. On the contrary it assessed the property at a sum nearly $5,000,000 below that valuation. Was this an extravagant valuation, in view of all facts before the board? Suppose it did adopt Mr. Finlay's method, will it be contended that if the valuation placed upon the mine was no greater than its owners would concede to be its value, because the method was employed the tax must be held invalid?"

—and it was held the court was not called upon by the record as made to overrule the action of the assessing officers.

Some of the earlier decisions in Pennsylvania cited by appellant's counsel support the contention of the State, but, as will be seen later, these decisions have either been modified or overruled by the later decisions in Pennsylvania. This was recognized in *Poole* v. *Union Trust Co.,* 191 Mich. at p. 169.

It may be well now to state the contention of the appellee. We quote from the brief:

"Appellee's claim is that the land described in the lease and the unaccrued rents and royalties in said land covered by said mining lease are real estate situated in the State of Minnesota. That they do not pass as a transfer of property in Michigan. That they are not subject to an inheritance tax in Michigan, and that to

subject this estate to the payment of an inheritance tax in the State of Michigan on the transfer in question would be in conflict with the Constitutions of the State of Michigan and of the United States, as not giving equal protection of the laws and as taking property without due process of law.   *   *   *

"We submit that the land covered by the lease in question, the mining lease thereon and the unaccrued royalties on the ore therein payable under the lease, are real estate situated in the State of Minnesota and that the laws of that State control the character of the property as to whether it is real estate or personal property. If this is true, it follows that the interest of the estate of Mr. Rust in this Minnesota land and mining lease thereon is not a credit or personal property the transfer of which is subject to the payment of an inheritance tax in this State.   *   *   *

"Whether the land and the rights of the lessor in the mining lease in question is real estate must be determined by the laws of Minnesota where the land lies. The rule is that will provisions concerning real estate are controlled in their operative effect by the laws of the State wherein the land is situated, and not by the laws of the State of the testator's domicile. The doctrine is thus stated by the Supreme Court of the United States, the present Chief Justice writing the opinion in *Clarke* v. *Clarke,* 178 U. S. 186, at p. 190 (20 Sup. Ct. 873) ; approved by Justice Day in *Olmsted* v. *Olmsted,* 216 U. S. 386, 393 (30 Sup. Ct. 292, 25 L. R. A. [N. S.] 1292) :

"'It is a doctrine firmly established that the law of a State in which land is situated controls and governs its transmission by will or its passage in case of intestacy. This familiar rule has been frequently declared by this court, a recent statement thereof being contained in the opinion delivered in *DeVaughn* v. *Hutchinson,* 165 U. S. 566 (17 Sup. Ct. 461), where the court said (page 570):

"'"It is a principle firmly established that to the law of the State in which the land is situated we must look for the rules which govern its descent, alienation and transfer, and for the effect and construction of wills and other conveyances."'"

Counsel cite many other authorities to the same effect.

We are furnished with long and able briefs to show the contentions of the respective parties. The issue involved is a clear cut one. We have already said enough about the authorities cited by appellant to indicate that we are of the opinion they are not controlling. We think counsel for the State have not sufficiently emphasized the fact that the lessee may at any time terminate the lease by giving 30 days' notice. Nowhere in the contract is it agreed that the lessee will mine and pay for all the ore in the land. It is also agreed therein that if the lessee fails to perform its agreement the lessor at once may take possession of and control the land and mineral as though the agreement had not been made.

Questions similar to the ones involved in the instant case have been before the supreme court of Minnesota. The case of *State* v. *Royal Mineral Ass'n,* 132 Minn. 232 (156 N. W. 128), is instructive. We quote:

"The defendant was assessed for the year 1913 for 'credits' at a valuation of $30,000. The alleged credits were made up of the minimum amounts agreed to be paid under certain iron mining leases of land owned by defendant in this State. These instruments are nine in number. They run for a fixed term, in most cases for 50 years from their date, but are terminable by the lessees on notice. Eight of them are terminable on 30 days' notice; one of them on 90 days' notice. One of these instruments is submitted as a fair sample of all. It is a lease in form. It grants possession to the lessee. It provides that the lands are leased for the purpose of exploring for, and mining and taking out, ore, and authorizes the lessee to construct all buildings, ditches, drains, wagon roads, railroads and other improvements on said land incident to such mining operations, and gives the right to cut certain of the timber on the land for fuel and other purposes incident to such operations. The lessee agrees to mine and remove at least 150,000 tons of ore annually and to pay a royalty of 25 cents per ton upon all ore mined, or at his option to pay 'an advance

royalty, which shall be treated and considered as ground rent,' of 25 cents per ton on said minimum, though less than the minimum is mined, or none is mined at all.   This 'advance royalty' is payable in advance, it may be, of mining operations.   It is not, however, payable in advance as that term is commonly used in leases, but it is payable in the months of January, April, July and October of each year for the three months next preceding.   *   *   *

"At the outset it is important to consider the nature of these so-called mining leases.   Their nature is not an open question in this State.   It is settled that they are leases in fact, as well as in name.   (Citing authorities.)

"The earlier Pennsylvania cases announced the doctrine that such instruments were sales of the mineral in place.   *   *   *   On this point these earlier cases are overruled by the later cases above cited, which hold, in substance, that while a contract regarding mineral in place may be a sale, or a lease, or a license, depending on its terms, an instrument such as the instruments we have here under consideration is 'at common law a lease without impeachment of waste,' that the amount paid by the lessee is rent and not the purchase price of mineral in place, that the lessee is in the position of a lessee of a house, bound to pay rent whether he occupies it or not.   *Denniston* v. *Haddock*, 200 Pa. 426, 428, 429 (50 Atl. 197) ; *Girard Trust Co.* v. *Delaware & Hudson Co.*, 246 Pa. 161 (92 Atl. 129).   Few, if any, State courts follow the early Pennsylvania decisions.   *   *   *

"We adhere to the doctrine of the *Evans* and *Boeing Cases*, and hold these instruments leases.   It follows logically that the amounts stipulated to be paid by the lessees are rents, and they were expressly held by this court to be rents in the *Boeing Case, supra,* a case which involved a construction of the very leases now before the court.   They are 'the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows.' "

In *Minnesota Loan & Trust Co.* v. *Douglas,* 135 Minn. 413 (161 N. W. 158), it is said:

"The first proposition to be determined is the char-

acter of royalties, or the income derived from mining leases given and to be given upon these lands. The contention of appellant is that these are not rents and profits from real estate, but constitute capital, or land converted into personalty, because as the ore is mined the value of the land is proportionately and permanently depreciated. The respondent maintains that by the decisions in *State* v. *Evans,* 99 Minn. 220 (108 N. W. 958, 9 Ann. Cas. 520) ; *Boeing* v. *Owsley,* 122 Minn. 190 (142 N. W. 129) ; and *State* v. *Royal Mineral Ass'n,* 132 Minn. 232 (156 N. W. 128), it is now settled law in this State that royalties under mining leases constitute rents and profits from land. The importance of the question, as met in each of the cases mentioned, was fully appreciated by the court and the well-recognized standing and ability of counsel, who represented the parties therein, vouch for the thoroughness with which every argument and point was pressed upon the attention of the court. Of these cases, the *Boeing Case* is closely related to the one at bar, since it determined that royalties from mining leases were to be considered as rents and profits from real estate in the distribution and descent of property. Eminent counsel now urge that the precise question here presented was not involved in any one of the three cases mentioned. In a certain sense this is true; at the same time the nature of a mining lease, whether it constitutes a sale in place of the ore so as to be a conversion of realty into personalty, or whether it returns to the lessor what is ordinarily termed rent from land, was considered from every angle, and the result reached in each case, that it was the latter."

In *Von Baumbach* v. *Sargent Land Co.,* 242 U. S. 503 (37 Sup. Ct. 201), the leases involved were substantially the same as the ones before us. Mr. Justice Day, speaking for the court, commencing on page 517, said:

"The nature of these mining leases has been the subject of some difference of opinion in the courts. The circuit court of appeals in this case took the view announced in some of the earlier cases, notably in Pennsylvania, that the leases were such in name only,

and were in fact conveyances of the ore in place as part of the realty, and that the so-called royalties merely represented payments for so much of the land and were in no just sense income, but mere conversions of the capital.

"These lands are situated in Minnesota, and this character of lease has long been familiar in that State as a means of securing the development and operation of mining properties. Some years before the passage of the corporation tax act, the supreme court of Minnesota had dealt with the character of such instruments. In the case of *State* v. *Evans*, 99 Minn. 220, that court, after a review of the English and American cases, said (p. 227) :

" 'The propriety of a lease for the purpose of developing and working mines is recognized by all of the cases, and the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land, and further that iron or other materials derived from the usual operation, of open mines or quarries, constitute the rents and profits of the land, and belongs to the tenant for life or years, and to the mortgagor after sale on foreclosure, and before the expiration of the time for redemption. The rule, however, has no application to unopened mines in the absence of a contract, express or implied for opening and leasing them.'

"The same doctrine was held in *Boeing* v. *Owsley*, 122 Minn. 190 (142 N. W. 129), and in the late case of *State* v. *Royal Mineral Ass'n*, 132 Minn. 232 (156 N. W. 128), in which the decision of the circuit court of appeals in this case, that such leases were merely conveyances of the ore in place, was brought to the attention of the court, and that conclusion expressly denied the supreme court of Minnesota saying:

" 'We adhere to the doctrine of the *Evans* and *Boeing Cases*, and hold these instruments leases. It follows logically that the amounts stipulated to be paid by the lessees are rents, and they were expressly held by this court to be rents in the *Boeing Case*, *supra*, a case which involved a construction of the very leases now before the court. They are "the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows." ' Lord Denman in *Queen* v. *Westbrook*, 10 Q. B. 205.

"These conclusions of the supreme court of Minnesota are not only made concerning contracts in that State, such as are here involved, but are supported by many authorities. Ordinarily, and as between private parties, there is no question of the duty of the Federal court to follow these decisions of the Minnesota supreme court, as a rule of real property long established by State decisions. *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 360 (30 Sup. Ct. 140)."

In *United States* v. *Biwabik Mining Co.*, 247 U. S. 116 (38 Sup. Ct. 462), it was said in part:

"In the *Sargent Land Company Case* it was pointed out that the courts of Minnesota, certainly familiar with the physical characteristics of the ore deposits involved, had in a series of cases held these instruments to be leases, and that the royalties agreed to be paid were rentals in compensation for the privileges granted the lessee. We held the conclusion of the Minnesota courts to be warranted by reason and authority. (242 U. S. 503, and cases cited in margin, p. 518.)    *    *    *

"In the *Sargent Land Company Case* the circuit court of appeals for the eighth circuit found that the land including the ore in it was worth hundreds of thousands of dollars, and without the right to the ore the land was worth practically nothing. (134 C. C. A. 649, 219 Fed. 38.)    This finding, as well as facts of general knowledge, leaves little room to suppose that this court made its decision concerning the rights of the lessor influenced by the fact that the land itself was the chief thing, and the ownership of it after the exhaustion of the minerals one of the controlling reasons in reaching the conclusion announced in that case. The lessee takes from the property the ore mined, paying for the privilege so much per ton removed.   He has this right or privilege under the form of lease here involved so long as he sees fit to hold the same without exercising the privilege of cancellation therein contained.   He is, as we held in the *Sargent Land Company Case*, in no legal sense a purchaser of ore in place."

The reasoning of these cases is persuasive. Sup-

pose in the instant case that after the will was made and before the death of Mr. Rust the lessee had exercised its right to terminate the lease, would not the widow and the daughter take under the will the real estate with the ore included? or suppose in like case the testator had not used the words "all my right, title and interest of every name, nature and description in and to" the land, Is it not clear that the widow and daughter under the will would get, so far as the Minnesota real estate and mining property are concerned, an interest of but little value? We are constrained to hold that a proper disposition of the case was made in the court below.

The judgment is affirmed.

STEERE, C. J., and FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.

The late Justice BROOKE took no part in this decision.