BERRY ET AL., APPELLANTS, *v.* McCOURT ET AL., APPELLANTS; BERRY ET AL., APPELLEES.

[Cite as Berry v. McCourt, 1 Ohio App. 2d 172.]

(No. 7066—Decided January 27, 1965.)

*Messrs. Lucas, Prendergast, Albright & Warren*, for appellants.

*Messrs. Hamilton & Kramer*, for appellees Paul F. Berry, Girard F. Berry and Edward A. Berry.

*Messrs. Key, Butler, Harrison & Carlisle*, for appellee Urban J. Berry.

DUFFEY, J. This is an appeal on questions of law and fact involving the interpretation and enforcement of an alleged

*inter vivos* trust. The case is, therefore, before this court on its merits for a *de novo* determination based on the pleadings and evidence.

The action arises out of an alleged *inter vivos* trust created by Richard G. Berry, Sr., in 1924. He conveyed certain property to his five sons as trustees and as beneficiaries. In 1952, Richard G. Berry, Jr. (II), died leaving five children. Two of the children, Richard G. Berry (III) and Patrick J. Berry, brought this action against the surviving trustees-beneficiaries. The other three children of Richard G. Berry, Jr. (II), are joined as defendants.

The principal issues presented are (1) the nature and validity of the trust instrument, (2) the rights of the plaintiffs to income of the trust since 1952, (3) the rights of the trustees to withdraw funds for "salaries," and (4) the obligation of the trustees to invest certain unproductive bonds. By their answer, three of the trustees have added an affirmative defense regarding the plaintiffs' standing or right to maintain this action.

Richard G. Berry, Sr., was the owner and sole proprietor of an industrial plant and business known as Berry Brothers. On September 17, 1924, he executed an instrument entitled "Deed of Trust." It complies with all the required formalities of a deed, and conveys "my bolt and nut works, plant and business, located on East First Avenue, in said city, in trust, for certain designated purposes and uses * * *." Grantees were the settlor's five sons—Paul, Girard, Edward, Richard, Jr. (now deceased), and Urban. The granting clause contains a legal description of real property and also transfers the bolt works, plant, machinery, stock and business, good will and business name, all subject to existing indebtedness which is to be assumed by the grantees.

The terms of the trust are certainly most unusual and perhaps unique. Under Item First, the five sons are made trustees in their "collective capacity," to own, control, operate and manage the business. It further provides that the "grantees are each expressly given the right and privilege to participate in said property and business, and the profits, dividents [sic], earnings and increase thereof * * *." Item Third provides that "each of the five several interests of said grantees" shall be

evidenced by a certificate. The holder of the certificate "shall be entitled to one-fifth of all dividends which shall be declared and paid from the net profits * * *."

The trust instrument contains provisions and uses a drafting approach common to the once popular business trust or so-called "Massachusetts Trust," although it is, of course, tailored to fit certain apparent desires of the settlor, Richard G. Berry, Sr. Item First contains a declaration that no "merger" shall occur because of identity of the persons who are trustees and beneficiaries. Item Fifth contains a disclaimer of various rules of partnerships. Most striking are the provisions on "shareholder" certificates in establishing the issuance of certificates. Item Third provides they are to be "alienable and transferable." However, it also immediately provides that no interest shall be sold, pledged or otherwise disposed of, except with the consent of a majority of the trustees, or until first offered for sale to the trustees. The trustees have the option for one year of having a three-man appraisal and then purchasing at the appraised value. Any interest so purchased can be held as part of the corpus or sold. The form of certificate is set out in full.

Item Fourth is an exculpatory provision for the benefit of the trustees and will be discussed later.

Item Fifth contains provisions purporting to limit beneficiary rights. However, particularly pertinent is the provision that "the heirs, devisees, executors, administrators or assigns of any deceased shareholder shall succeed to the rights of such decedent * * *." However, the successor is not to acquire any of the powers of the trustee. Rather, such powers are to remain in the originally-named trustees.

Item Sixth provides for three methods of termination:
(1) Upon the death of four of the five grantees-trustees.
(2) Upon unanimous vote of the trustees "of all their number."
(3) Upon unanimous vote of the trustees "of-all their members" to transfer to a corporation, in which event the shares of the corporation are to be distributed according to the interests in the trust.

From 1926 through 1934, each of the settlors drew an equal amount as "salary." In that year, Urban became inactive in the business operations, and his four brothers cut his partici-

176

pation very substantially. Urban brought a suit which was settled in 1942. The settlement contract provided for the "compensation" and "salary" of the "active" trustees as opposed to that of Urban so long as he remained inactive in the management of the business. A majority of the "active" trustees were to fix the salary. However, the contract explicitly provided that the active trustees were to receive *"not more* than twenty thousand dollars ($20,000) each, per year," and Urban J. Berry $9,500. (Emphasis added.) It further provided that if the salaries were fixed "at lesser sums" for any active trustee, then Urban's salary shall be as set forth in the table. The table ranges from $20,000 down to $1,000 for active trustees, and correspondingly from $9,500 to $250 for Urban.

Paragraph two of the contract provided that if the affairs and net profit justify it, the active trustees could set aside such surplus, sinking and depreciation funds as they deem advisable and declare an "annual dividend." Provision was made for Urban to become active again. There was a peculiar provision for termination when only two trustees remained alive. The contract also provided for certain lump sum payments as settlement of the disputes arising from earlier years, plus a release from all claims, etc., and a declaration that the contract was not intended as a termination of the trust.

Defendant's exhibit No. 1 shows that in fact the contract was never followed from the time of its execution through 1958. In 1943, the four active brothers drew $40,000 each and Urban $30,106. From 1944 through 1957, the active brothers drew salaries ranging from $45,000 to $32,500 each, and Urban between $35,000 and $22,500. Pertinent here is the fact that from the death of Richard, Jr., in 1951, through 1959 the four surviving brothers withdrew a total of $889,000 in "salaries" and $80,000 in "dividends." The heirs of Richard, Jr., during the same period received $20,000 ($4,000 each).

The fundamental issue in this case is the nature and legal effect of the 1924 "Deed of Trust." The defendants contend that the instrument did not create a private trust, but rather a so-called "business trust," often called a "Massachusetts Trust." One defendant has suggested that if it was not a valid business trust it would be a partnership.

The legal effect of the instrument and the relationship

among the five sons created by it obviously could not be a partnership. One of the most elementary attributes of a partnership is the voluntary, consensual, contractual basis of the arrangement. No partnership can be created or imposed upon another by the donation of property.

The so-called "business trust" is a voluntary combination or pooling of capital by a number of persons for the purpose of investment for profit. A comprehensive study of the law with respect to such devices may be found in "Massachusetts or business trusts," 156 A. L. R. 22. See, also, Bogert, Trusts and Trustees (Second Ed.) 571 *et seq.*, Section 291 *et seq.* It has never been a popular business device in Ohio. Its validity under our corporation and partnership laws has never been directly passed upon, although comments can be found in *Goubeaux, Recr.,* v. *Krickenberger, Exrx.* (1933), 126 Ohio St. 302. The court there strongly indicated that most such arrangements undertaken in Ohio would legally constitute a partnership. The court also implicity suggested that to avoid partnership the device would have to meet the prerequisites of a valid private trust.

In states which give liberal recognition to the "business trust," it manages to escape much of the basic doctrine applicable to private trusts. The basis for evading trust law essentially is that the business trust is in fact a voluntary, consensual and contractual relationship. It is a device for profit making which arises from the consensual combination of capital and a contractual agreement by a number of investors. By an underlying contract, or in the provisions of a business trust instrument, or both, the parties *agree* on the operations of the venture. In effect, they agree, notwithstanding trust law, to forego rights and accept limitations which would otherwise apply. It is this unique contractual feature, plus the purpose of the combination, which has led courts of other states to permit the device to operate in ways quite at variance with trust law. It is, therefore, not so much a trust as a contractual relationship based on trust form which in result is about half partnership and half corporate.

The transaction here cannot be characterized as a business trust. It arose from a gift—the grant by Richard G. Berry, Sr., as donor. Neither the grantees-trustees nor the bene-

ficiaries (who initially were the same persons) contributed any capital. They did not enter into a contractual relationship with the donor or among themselves in order to create the relationship established.

There have been numerous comments to the effect that the trust instrument here created something which resembles a corporation. It is not a corporation, and it is not helpful to analogize it to corporate law or to use corporate terms.

The plain fact is that the instrument meets all the obvious prerequisites of a valid private trust. See 54 American Jurisprudence, 43, Trusts, Section 30, and 89 Corpus Juris Secundum 775, Trusts, Section 43. There was a person competent to create a trust. The instrument shows an unequivocal intent to do so. There is a corpus and a complete disposition of it. There are named trustees and identifiable present and contingent beneficiaries capable of holding the beneficial or equitable estate. A careful review of the provisions does reveal very broad powers in the trustees to terminate both directly and indirectly. There is overlap of trustees and beneficiaries. The beneficial interest of the plaintiffs here was highly contingent at the origin of the trust. It could vest only if their father died before the trust terminated and he had not disposed of his interest in life or by will. However, all these contingencies did come to pass, and their beneficial interest did ripen into present enjoyment. Broad as the various provisions may be, they do not, in our opinion, invalidate the trust. The parties having accepted and acted on it for some 40 years, we hold that the instrument created, and there is still in existence, a valid enforceable private *inter vivos* trust.

As a trust, the rights of the beneficiaries and the powers and duties of the trustees are controlled by the terms which are and can lawfully be imposed by the instrument. While the petition contains some broad allegations, on the record no serious challenge is made to the overall management of the trust or in particular to the general management of the business. There are two specific disputes, one involving the failure to carry casualty insurance and the other involving the investment of certain funds. These will be discussed infra. The principal dispute is over the legal nature and extent of the plain-

tiffs' interest, and the powers and duties of the trustees with respect to the handling of the trust income.

The major source of controversy lies in the handling of trust income and in particular in the withdrawal of funds by the trustees for their own use. This, in turn, can be narrowed. It is apparent that the era from the creation of the trust to the vesting of the plaintiffs' interest upon the death of their father is moot. The 1942 settlement contract was between all the parties who then held an interest in income. The contract disposed of all questions to that date. While the terms of the contract as to "salaries" were not in fact followed after 1942, there was clearly acquiescence by all persons who held the beneficial interests from 1942 until Richard, Jr.'s, death. In any event, the plaintiffs here do not challenge the conduct of the trustees prior to their father's death.

Defendants have contended that the 1942 contract also binds the plaintiffs here. It is argued that plaintiffs are in privity with their father and "estopped" to challenge the withdrawal of funds by the trustees *since 1952*. This contention is without merit. There is no provision in the trust which grants the trustees authority to set their own compensation, and it would be of dubious effect if there were. As to the 1942 contract, defendants are not relying on the settlement feature, but rather on the prospective provisions as they might apply from 1952 on. In that aspect of the contract, its legal significance is not derived from the signatures of the defendants as trustees. The significant thing was their joinder as beneficiaries who held all of the then present interest in the income of the trust. Until 1951, the plaintiffs' rights were only contingent, and they held no present interest in any charge against or distribution from income.

Defendants also have confused inheritance with the vesting of a beneficial interest by virtue of the trust itself. While Richard, Jr., had the power to dispose of his interest by transfer during life or by will, he did not do so. By the terms of the trust, the interest vested in his heirs under Item Fifth. The law of intestate succession and inheritance has relevance only by reason of its use by the settlor to identify the beneficiaries in the trust instrument. Plaintiffs' interest was created by the

settlor, Richard G. Berry, Sr., and not by their father, Richard, Jr. The contract in 1942 and the acts of the life-beneficiary, Richard, Jr., have no effect upon or relevance to the plaintiffs' position from the time their interest vested. Their rights are those defined by the trust.

It might be noted that the beneficiaries of the Berry trust are defined in a manner similar to that in *Gwinner, Exr.,* v. *Schoeny* (1960), 111 Ohio App. 177, and in many family trusts. See 54 American Jurisprudence 120, Trusts, Section 144. In *Gwinner,* the beneficiaries were the settlor's five sons for life, and then to each's "issue, per stirpes." In the present case, it is the five sons and to each's "heirs" (others not being relevant at present).

From its inception, this trust has been run as if it were a family proprietorship owned by the five sons. About the only recognition of the status of the trust appears as a result of the dispute with Urban. It does not appear that the trustees have ever set up proper trust accounts for principal and income. The accounts in evidence are basically in business form. In trust law the basic distinction is between principal and income. In this trust, a further basic distinction is between retained income and distributable income.

Item First of the trust provides that the trustees "shall own, control, operate and manage said property, works, plant and business * * *." The prefatory recitals, and indeed the whole tenor of the instrument, show the settlor's desire and direction for the continuation of the business during the life of the trust. In fact, just about the only clearly discernible purpose of the transaction is to keep the business in the family and under family control as much and as long as reasonably possible. Any business of the type here must have reserves for operating purposes. In our opinion, the trustees' duty and authority to continue and manage the business necessarily implies authority to establish reasonable reserve accounts for legitimate business purposes based on the needs of this and like operations. Such reserves may be funded by allocations out of the trust income, *i. e.,* the earnings of the business and other income of the trust corpus. These accounts constitute retained income. The balance is distributable income.

The trust also involves certain necessary and reasonable

expenses of administration. A major expense item in this trust is the trustees' fees. Trustees are entitled to fees for their official acts and to have them paid from the trust. There is no provision in the instrument here for fees. Where there is no provision made by the instrument or by statute, the general rule is as stated in III Scott on Trusts 1931, Section 242.1:

"* * * In such a case the trustee is entitled to the fair value of his services in carrying on the business, and the compensation depends upon the character of the service rendered. * * *"

See, also, Bogert, Trusts and Trustees (Second Ed.) 279, Section 975. A thorough review of case law may be found in 99 A. L. R. 961.

As previously noted, the trust instrument here requires the continuation of the business and therefore the preservation of the trust principal which the business represents. Thus, both as a matter of general trust law and in view of the terms of this trust, the trustees' fees should be charged first against distributable income.

Plaintiffs contend that the amounts withdrawn by the trustees as "salary" or compensation for services have been in fact based on income and not on the value of the services. In apparent recognition of the trustees' right to some compensation, plaintiffs have argued that the amount paid to Urban may be taken as representing a distribution of income and therefore measures the amount that the plaintiffs and other children of Richard, Jr., are entitled to receive as the owners of a one-fifth interest. In a broad sense, there is much merit to this claim. On the evidence, Urban has taken no part in the management or operation of the trust both prior to and since 1952. On the evidence, it is patently clear that the amount paid to him since 1952 grossly exceeds any reasonable sum for his services as a trustee. However, we do not believe that such an arbitrary method may be used by the court as a basis for determining the amount of distributable net income since 1952. It would also provide no assistance in establishing the nature of the plaintiffs' rights to any future income.

In discussing trustees' fees and distributable income, it is no help to refer to the trustees' withdrawals as "salaries" for managing the business. That term, and the concept of salary, might be useful in determining the competitive profit and loss

position of the business. However, it is a business term. Whatever merit it might have in analyzing the business operations, it is misleading in any discussion of trust accounts and beneficial interests. Trustees' fees are *not* an item to be deducted from business return in order to arrive at trust income. The fees are an item to be charged against the trust income as an administrative expense of the trust.

As previously stated, the plaintiffs were not parties to, and were not bound by, the 1942 contract. No agreement has been made since their interest vested. Of course, all the parties in interest could agree upon the amount allowable from 1952 to date. An agreement could also be entered into for future compensation, subject to the objection of any new successors who may acquire a beneficial interest under the instrument. However, in the absence of agreement, the amount must be set by a court of equity based on evidence. Where, as here, the trustees have presumed to set their own fees and withdraw funds, the burden would be on them to show the reasonableness of the amounts taken.

In the present case, there is insufficient evidence of record to pass any judgment upon the reasonableness of the amounts withheld. While there is some basis in the amounts paid to Urban to indicate excessive fees, there is no basis for determining how much should be allowed. A supplementary application, based on equity jurisdiction or pursuant to Section 2721.09, Revised Code, may be used to review the amounts withdrawn by the trustees and also to determine a proper amount for current services. In view of the limited facilities of this court to take evidence, the case will be remanded to the Common Pleas Court, and such application, if any, should be filed in that court.

After all expenses which are allowable have been charged against distributable income, an issue arises as to the nature of plaintiff's rights to the distributable net income. From 1924 to 1952, the fact of the identity of persons holding the trustee and beneficial rights made this question academic. However, the defendants-trustees have continued to treat distribution of net income as discretionary in them. They now contend that under the terms of the trust one of the powers of the trustees is to determine what amount, if any, should be distributed.

From this it would follow that the plaintiffs would have no right to any immediate payment, although, of course, excessive fees would have to be restored. Reliance is placed on provisions in the trust referring to "dividends." It is contended that these give the trustees discretionary power to retain all or any part of the income regardless of its need in the business operations.

We have previously stated that the trustees do have discretion to retain income by setting up reserve accounts for the business. Having exercised that discretion, and having made proper charges for expenses, we find no authority to withhold payment of any balance.

The use in the instrument of business trust and corporate terminology does lend some difficulty to its interpretation. The basic provision is that which defines the grant of the beneficial interest. This is found in Item First and provides as pertinent:

"* * * said grantees are each expressly given the right and privilege to participate in said property and business, and the profits, dividents [sic], earnings and increase thereof, without regard to the relation as trustee which each grantee may bear to said trust."

Plaintiffs have, of course, succeeded to these rights by virtue of Item Fifth. The wording of this provision implies an absolute right. It contains no qualification or limitation within itself on the immediate enjoyment of the income. We have found one limitation to be implicit in the provision on the continuance of the business. Defendants contend that another is found in Item Third. The first sentence there provides that each beneficial interest shall be evidenced by a certificate. It then states:

"* * * The holder of each thereof shall be entitled to one-fifth of all dividends which *shall be* declared and paid from the net profits arising from the operation of the business, at the end of each quarter yearly period next following the creation of this trust." (Emphasis added.)

Defendants emphasize that the beneficiaries' rights attach to "dividends" which the trustees have "declared and paid." We are not impressed by the analogy of "dividends" to corporate law. Nor are we persuaded that the phrase "declared and paid" grants an implicit power to the trustees to retain all or any of the income in their discretion. Both in these provisions

and in comparable provisions found in the certificate form, the settlor is only describing the beneficial interest. Obviously, in any one quarter, the reserve account allocations and the charges against income may well leave no distributable net income. Mechanically, of course, the trustees must also go through the steps of determining the amount available for distribution and then declaring it if there be any. Most importantly, an examination of the whole instrument does not suggest any reason or purpose on the part of the settlor to postpone the distribution of income which is not needed in the business. On the contrary, the apparent purpose of the trust is to maintain the business and its income in his family, as a source of security and support for the beneficiaries—a purpose which has been well accomplished for the original five beneficiaries. If, then, the defendants' implication could be considered a reasonable one based on the isolated literal wording, we find nothing in the context of the trust instrument which requires the acceptance of that implication.

Accordingly, in our opinion, the most reasonable interpretation is, and we declare that, the trustees must quarterly determine the total income of the trust; they must determine the proper amount to be retained for allocation to establish business reserves; and they must make all properly allowable charges. The balance of the income, if any, is distributable net income, the absolute and immediate right to which vests in the beneficiaries proportionately.

Defendants have also contended that this entire action is barred by the terms of the trust. Reliance is placed on a provision found in Item Fifth:

"FIFTH: The death of a shareholder, during the continuance of the trust, shall not operate to terminate the trust, nor shall it entitle the legal representative of the deceased shareholder to an accounting, or to take any action in the courts, or elsewhere, against the surviving shareholders; but the heirs, devisees, executors, administrators or assigns of any deceased shareholder shall succeed to the rights of such decedent; nor shall the death of a shareholder operate to create any right in the surviving shareholders, or either thereof, to take over the share of such decedent upon any theory of surviving part-

ners, or to institute any proceeding in court, or otherwise, based upon such theory."

The personal liability of a trustee may be limited to some degree. A provision to that effect is found in Item Fourth. However, the right of a beneficiary to invoke equity jurisdiction to determine the nature of and enforce his rights under a trust cannot be validly taken away. In any event, we consider this provision inapplicable to the present action. By its terms, it merely attempts to exclude death as in and of itself a basis for proceedings. The present suit does not arise from death but from a bona fide dispute as to the nature and extent of the beneficial interest, and specific disputes on particular actions of the trustees. Defendants have also contended that the plaintiffs are asking for an accounting. Assuming there could be some valid reason for objecting to that relief, although we see none, we also fail to see that this suit involved equitable accounting. In a broad sense, the questioning of the trustees' withdrawal of funds without agreement or court approval on the amount could be referred to as asking them to account. However, more accurately, and in particular as to future compensation, plaintiffs are asking for a determination of fees, i. e., what amount is properly chargeable.

One specific dispute concerns some $104,000 in face value of United States bonds. The facts are stipulated. In 1931, the trust purchased $50,000 face value of bonds, which were called in 1951. In 1936, the trust purchased $54,000 face value of bonds, which were called in 1949. Interest accumulated to the call dates but has never been collected. The bonds have *not* borne any interest from the time they were called. They now apparently rest in a safety deposit box in the name of the trustees.

The stipulation does not indicate the source of the purchase money, but it would appear to be trust income. Again it is not clear, but apparently the bonds have not been allocated to any properly established and valid reserve account for the business. They may constitute distributable net income. However, since the evidence is so vague on this aspect, we make no determination in that respect.

On the other hand, one of the elementary duties of a trustee

is to invest. To leave some $104,000 (plus accrued interest to date of call) totally unproductive for some 14 years is amazing to this court. It can only be explained by assuming an attitude on the part of the trustees that trust assets could be treated as if they belonged personally to the trustees. Plaintiffs have made no request with respect to any loss from the failure to invest. They seek only to require investment now. They are clearly entitled to at least that relief.

Plaintiffs also protest the trustees' failure to carry casualty insurance on the industrial plant, equipment, etc. Our attention has been directed to a provision of Item Fourth that purports to impose an obligation on the "shareholders" to restore any impairment of capital, arising through error of judgment by the trustees, or from casualty. Plaintiffs have assumed that the word "shareholders" as used there includes them as beneficiaries.

In a business trust it may be that the settlors-beneficiaries could by mutual agreement assume liability for an impairment of principal or capital. However, a donor-settlor cannot impose personal liability on a donee-benefiiciary. The settlor could, of course, provide that any loss be restored out of trust income, although we make no determination that this provision in Item Fourth can be so interpreted. Since, in our opinion, there can be no personal liability, the issue presented is solely one of management policy and abuse of discretion.

It would not seem likely that similar businesses of this size and with this current asset ratio can reasonably proceed on the self-insurance principle. However, the reasonableness of the policy depends upon many factors, including information on the nature of the assets and the business, and the risks which might be involved. There is insufficient evidence to provide any reasonable basis for this court to evaluate the soundness of the trustees' decision. We, therefore, decline to include anything in the judgment at this time on this dispute.

An entry may be submitted covering the following basic matters:

(1) The 1924 "Deed of Trust" creates a valid subsisting private *inter vivos* trust.

(2) Plaintiffs presently hold their proportionate beneficial interest by virtue of succession under the terms of the

trust, their interest having vested upon the death of their father, Richard G. Berry, Jr.

(3) Plaintiffs' rights to and in trust income accrued since their interest vested are not limited or otherwise affected by the contract of 1942 between the then trustees and the then beneficiaries of the income.

(4) The trustees have reasonable discretion to retain such income as is reasonably necessary for the operation of the business and to establish reasonable reserve accounts for legitimate business purposes, and to fund them by allocations out of trust income.

(5) The trustees are entitled to reasonable fees, based on the value of their services in performing their official duties as trustees, including management of the business. Such fees are chargeable first against distributable income. In the absence of agreement by all parties holding a present interest in income, the amount allowable for fees must be determined by the appropriate court.

(6) All income in excess of that properly allocated to business reserves, and in excess of proper charges for expenses, is distributable net income, the absolute and immediate right to which vests in the beneficiaries proportionately. The trustees shall quarterly determine the total income of the trust, the amount to be allocated to proper and established reserve accounts, the amount of administrative expenses to be charged, and the amount of distributable net income due each individual beneficiary. Distributable net income, if any, shall be paid to or deposited in the account of each individual beneficiary.

(7) The amount due upon the United States government bonds now held by the trustees, and which are presently unproductive, shall be collected forthwith and the funds invested according to law.

(8) The court specifically makes no determination with respect to management policies or actions of the trustees other than those stated.

The cause is remanded to the Common Pleas Court for further proceedings according to law.

*Judgment accordingly.*

BRYANT, P. J., and TROOP, J., concur.