## In the Matter of the Trust Known as GREAT NORTHERN IRON ORE PROPERTIES.

### No. 47571.

Supreme Court of Minnesota.

Feb. 10, 1978.

---

Frank S. Farrell, Richard V. Wicka, Briggs & Morgan and Richard E. Kyle, J. Neil Morton and Steve A. Brand, St. Paul, for B. N. Inc.

Doherty, Rumble & Butler and Jack C. Foote, Frank Claybourne and Perry Wilson, Jr., St. Paul, for The Trustees of trust known as Great Northern Iron Ore Properties.

Arter & Hadden, Thomas V. Koykka and David G. Coleman, Cleveland, Ohio, Oppenheimer, Wolff, Foster, Shepard & Donnelly, William Oppenheimer and James R. Oppenheimer, John H. Wolf and Mark H. Stromwall, St. Paul, for Arms.

Harold Siegel, Minneapolis, for Margot Siegel.

ROGOSHESKE, Justice.

The subject matter of this extended litigation is the James J. Hill Trust, known as Great Northern Iron Ore Properties. In 1972, the trustees petitioned the district court for instructions as to their powers and

duties to convert trust assets to cash for distribution to income beneficiaries as termination of the trust term approaches.[1] The issue concerning the trustees' powers and duties comes before us a second time. In the first appeal, *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302, certiorari denied sub nom. *Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976), we reversed as clearly erroneous the trial court's findings that the trust should be terminated before its specified term, and that Burlington Northern, Inc., a successor in interest of the settlor, had no interest in the trust. We remanded for further proceedings to permit the trial court to answer the trustees' petition for instructions. Upon remand, the trial court instructed the trustees that they have the authority, and indeed the duty, to convert all trust assets to cash, in effect destroying the reversion for the benefit of the income beneficiaries as trust termination approaches. Upon this second appeal by Burlington Northern, we reverse with instructions to the trustees that they have the authority to convert trust assets to cash, short of violation of their legal duty of impartiality between trust reversioner and income beneficiaries, but have no duty to convert assets unless required to serve both reversion and income interests.

The history of the Great Northern Iron Ore Properties Trust was detailed in our prior opinion. The trust holds several thousand acres of Minnesota ore lands, which are mined by lessees under long-term royalty leases. After payment of trust expenses, the trustees in their discretion distribute royalties from the mining operations to the income beneficiaries, some 10,000 holders of 1,500,000 negotiable certificates of beneficial interest which are traded on the New York Stock Exchange.[2] Burlington Northern, Inc., as successor in interest to Great Northern Railway,[3] holds a reversion in all trust assets other than cash remaining at trust termination.

The present controversy between the income beneficiaries (hereafter certificate holders) and the reversioner, Burlington Northern, arises because of estimates that at present rates of mining a great share of the presently merchantable taconite supply on trust lands will remain unexhausted when the trust term expires. The certificate holders have sought to compel the trustees to mine the trust lands to exhaustion before termination of the trust or, if that proves impossible, to convert all trust properties to cash for their exclusive benefit under trust paragraphs 4, 9, and 17.[4] Re-

---

1. The trust instrument provides that the trustees may sell any or all trust properties, may distribute proceeds to income beneficiaries, and shall on trust termination convey all remaining money to the income beneficiaries and all other property remaining to the settlor or its successor. The trust term specified is the duration of 18 lives in being at trust creation in 1906 plus 20 years. See, footnote 4, *infra.* At the time of initial trial in this case, 5 of the 18 persons named as measuring lives were still living.

2. See trust paragraph 4, footnote 4, *infra.* The original certificates of beneficial interest were issued to shareholders of Great Northern of record on December 6, 1906.

3. Great Northern acquired its reversion by assignment in 1913 from the trust settlor, Lake Superior Company, Ltd.

4. The trust provisions pertinent to these proceedings provide as follows: "4. After payment made of or provision made for the expenses of said trust, the said trustees shall, from time to time, and at least once in every

year, distribute and pay such portion of the net income or proceeds of the property held by them as such trustees, as they may deem proper to be so distributed, among and to the persons appearing as shareholders of the Great Northern Railway Company, registered as such upon its books at the close of business on the 6th day of December, A.D. 1906, and to their assigns, under and by virtue of assignments made in accordance with the provisions therefor hereinafter contained.

\* \* \* \* \* \*

"9. The trustees shall have full power, during the continuance of this trust, to sell at public or private sale, or exchange for other property, or otherwise dispose of all or any part of the shares of stock hereby transferred to them, or any other property that may have become subject to this trust; and to invest the proceeds of any such sale or sales in other property; and in case of such re-investment the property so acquired, as well as all property acquired by the trustees in exchange, or otherwise, for property held by them under this trust, shall be held by the trustees under the

versioner Burlington Northern has sought to obligate the trustees to "continue the orderly mining" of the trust properties, preserving lands not thereby consumed for the reversioner at trust termination. The trustees, beset by these conflicting demands of the successive beneficiaries, petitioned the district court for instructions in 1972. In their amended petition to the district court, the trustees asked—

> " '* * * whether or not they have authority to convert all assets in their hands to cash as termination of the Trust becomes imminent, to the extent practicable. If the court finds they have [authority] then they wish to be instructed as to whether they have the duty so to convert.' "

In initial proceedings before the first appeal, the trial court found the trust instrument ambiguous and admitted a great volume of extrinsic evidence. Rather than issue the requested instructions, the trial court declared the trust terminated before its full term and, finding that the settlor had intended the railroad to have no interest in the lands, ordered the trust assets transferred to a corporation for the sole benefit of the certificate holders. On the appeal from that order, we reversed, holding that the trust instrument was not ambiguous and that the trial court's admission of extrinsic evidence, its findings, and its termination of the trust were clearly erroneous.[5] We remanded to permit the issuance of instructions, consistent with our opinion, as originally requested by the trustees.

Upon remand, the trial court instructed that the trustees have unlimited authority to convert the trust assets to cash for the certificate holders. The trial court based its finding of unlimited authority upon the broad power of sale conferred in trust paragraph 9, an alleged "practical construction" of the trust instrument,[6] and a finding that the trustees of a "business trust" of "wasting assets" are exempted from any limits imposed upon their powers by the law of trusts and successive estates. In its memorandum of instructions, the trial court further instructed that the trustees in fact have a duty to exercise their power of sale to destroy the reversion by converting all trust assets to cash for certificate holders before the end of the trust term. In support of this finding, the trial court has again referred to the extrinsic evidence which we found inadmissible on the last appeal. Based upon this evidence, a reading of trust paragraphs 4 and 9, and inferences from the historical background of the trust relating to the acquisition of the ore lands, the trial court has "gleaned" a settlor's intent to benefit only the certificate holders to the exclusion of "any possible reversioner." This alleged intent of the settlor is supposed to give rise to a duty to exercise the power of sale in destruction of the reversion.

Since both parties now concede and trust paragraphs 4 and 9 unambiguously provide

---

same trust and with the same powers and duties in respect thereto as are hereby provided in respect to the property herein described and conveyed.

   \*    \*    \*    \*    \*    \*

"17. Upon the expiration of the twenty (20) years next following the death of the last survivor of the before mentioned persons upon whose lives the said trust is limited, the trustees shall at once proceed to wind up the affairs of said trust. After paying or providing for all expenses or obligations of the trust they shall distribute ratably among the certificate holders all moneys remaining in their hands as such trustees, and shall convey and transfer unto the party of the first part, or its successors, or assigns, all property, save said moneys, held by them under said trust.

"And thereupon said trust shall cease."

5. Specifically, we held that the trust was unambiguously intended to terminate at the end of 18 specified lives in being at trust formation plus 20 years, not before; that a reversionary interest was unambiguously and validly created in the trust instrument; and that the reversion legally resides in Burlington Northern at present. We held that it was clearly erroneous to have admitted the volumes of extrinsic evidence permitted by the trial court and further found that, even if considered, the extrinsic evidence did not establish the intent attributed to the settlor by the trial court.

6. The trial court found that the trustees have in practice been liquidating trust property and distributing the proceeds to certificate holders for some 70 years of trust administration.

**616**

that the trustees have full authority to sell assets, reinvest, and distribute proceeds of sale, the issue on this appeal narrows itself to what the trustees' duties are with respect to the exercise or nonexercise of their powers of sale and distribution.

We consider first the arguments of the parties concerning what duties may be imposed upon the trustees in the exercise of their powers of sale and distribution by the trust instrument, extrinsic evidence, or an alleged "practical construction." Secondly, we consider what duties with respect to exercise of those powers are imposed upon the trustees by law.

I. *Duties imposed by the trust instrument, extrinsic evidence, or practical construction.*

■ Charles and Elizabeth Arms, intervening certificate holders,[7] and the trial court have looked to the trust instrument, considered extrinsic evidence of the settlor's intent, and applied "practical construction" to impose a duty to exercise the power of sale for the sole benefit of certificate holders. Burlington Northern challenges the propriety of relying upon extrinsic evidence, disputes the alleged practical construction, and relies upon the trust instrument and this court's prior opinion to argue that finding a duty to convert trust assets would be inconsistent with our former opinion. We hold that the trustees' powers of sale and distribution under trust para-

graphs 4 and 9 are discretionary, and no duty to exercise or refrain from exercising those powers is created by the trust instrument, extrinsic evidence, nor any practical construction.

*Trust instrument*

■ The Arms certificate holders contend that trust paragraph 9, providing an unlimited power of sale should be read as obligating the trustees to use that power to liquidate all trust assets as trust termination approaches. We do not agree. It is true that trust paragraph 9 contains no limit on the power of sale and that trust paragraph 4 permits distribution of proceeds without requiring reinvestment. But these unambiguous trust provisions clearly do not *require* the trustees to exercise the powers conferred. The decision to exercise the powers is left to the trustees' discretion.[8]

■ The Arms certificate holders also contend that trust paragraph 17, directing the trustees to "wind up" trust affairs at the end of a trust term 1 year short of the statutorily allowed perpetuities period,[9] should be read as requiring liquidation of all trust assets during the final year of the trust period solely for the benefit of the certificate holders. The Arms cite a number of cases in support of the proposition that a direction to "wind up" the affairs of a partnership, corporation, or other business association means to convert all assets to

---

7. Respondents Charles and Elizabeth Arms, two of the holders of certificates of beneficial interest in the trust, intervened on their own behalf in the trustees' original action seeking instructions from the district court. The Arms represent themselves as holders of 10,000 of the 1,500,000 outstanding certificates of beneficial interest; they do not represent holders of the remaining 1,490,000 certificates. The Arms and reversioner Burlington Northern have been the principal intervening litigants in these proceedings initiated by the trustees.

8. It may be, as Burlington Northern argues, that the unlimited powers of sale and distribution were included in the trust instrument in 1906 merely to assure compliance with 1905 trust and estate laws potentially invalidating powers of accumulation or unlimited restraints on alienation in trusts of this type. See, R.L.

1905, §§ 3203, 3204, 3225, 3226, 3249(6). See, also, *State v. Evans*, 99 Minn. 220, 108 N.W. 958 (1906) (royalties from mining leases were "rents and profits" of land). Whatever weight that argument may have in determining the settlor's intentions, however, we find it unnecessary to speculate upon the reasons for inclusion of the paragraphs 4 and 9 powers. The trust instrument is unambiguous. The powers were included, they were unlimited, and they were made discretionary. There is no obligation in trust paragraphs 4 and 9 that the powers in question be exercised.

9. See trust paragraph 17, footnote 4, *supra*. Revised L.1905, § 3249(6), effective at the time of trust formation, limited the permissible duration of a trust term to lives in being at trust formation plus 21 years.

cash for proper proportional distribution among creditors and owners.[10] Relying upon these cases, they seek to attribute a similar meaning to the words "wind up" in trust paragraph 17. In our view, the words "wind up" in the context of paragraph 17 cannot reasonably bear the meaning attributed to them by the certificate holders. The cases cited by the Arms are not applicable. Unlike those cases, this litigation does not concern a partnership or business association in which "wind[ing] up" would require liquidation of all assets in order to fairly distribute proportions corresponding to proportional ownership or creditors' interests in each asset. The words "wind up" can mean different things in different contexts. In the context of trust paragraph 17, the meaning intended is further defined:

> "* * * After paying or providing for all expenses or obligations of the trust they shall distribute ratably among the certificate holders all moneys remaining in their hands as such trustees, and shall convey and transfer unto the party of the first part, or its successors, or assigns, all property, save said moneys, held by them under said trust."

Had the settlor intended to require conversion of all trust assets to cash, it could have so provided. Instead, a reversion was provided for unconverted, noncash properties.[11] The Arms also assert that the provision to "wind up" the trust 1 year before it is legally required to be terminated, evidences an intent that the potentially lengthy process of converting all trust assets to cash be

undertaken. We find this argument unpersuasive as well. During the period when the trust was drawn, trusts were commonly drafted to last for lives in being plus 20 years rather than the statutorily allowed lives plus 21 years, without regard to whether liquidation of trust assets were contemplated. See, e. g., *Minnesota Loan & Trust Co. v. Douglas,* 135 Minn. 413, 161 N.W. 158 (1917). The trust instrument plainly does not impose any duty to exercise or not to exercise the powers of sale and distribution granted in paragraphs 4 and 9.

### Extrinsic evidence

The trial court relied upon certain excerpts from letters and statements made by James J. Hill which allegedly show that he expected the trust lands' merchantable-ore supply to be exhausted before the end of the trust term. Based upon this extrinsic evidence, the trial court concluded and the Arms certificate holders assert that the trust settlor [12] intended that the reversioner should receive nothing of value. It is speculated from the extrinsic evidence that a direction to sell off valuable lands at trust termination would have been included had James J. Hill realized that the lands would indeed be rich in unmined merchantable taconite at the end of the trust term. But such a direction was not included.

In our prior opinion in this case, we held that admission of the very evidence now relied upon was clearly erroneous. Trust paragraph 17 is unambiguous. It provides a reversion of all noncash trust assets held at trust termination. The reversion in

10. See, e. g., *Bagg v. Osborn,* 169 Minn. 126, 210 N.W. 862 (1926) (partnership); *Northwestern Railroader v. Prior,* 68 Minn. 95, 70 N.W. 869 (1897) (corporation); *In re People's Live Stock Ins. Co.,* 56 Minn. 180, 57 N.W. 468 (1894) (corporation); *Arthur v. Willius,* 44 Minn. 409, 46 N.W. 851 (1890) (corporation); *Polikoff v. Levy,* 132 Ill.App.2d 492, 270 N.E.2d 540 (1971) (joint venture); *May v. Brewster,* 187 Mass. 524, 73 N.E. 546 (1905) (estate of real estate not allocable in kind); *Kountze v. Smith,* 135 Tex. 543, 144 S.W.2d 261 (1940) (business trust).

11. The Arms have asserted on appeal that the reversion was provided only for nonmining, railroad-type properties, and that all mining

properties were to be converted to cash for certificate holders under trust paragraph 17. Clearly, there is nothing in the trust instrument to support such an interpretation, nor do we find that view supported by the extrinsic evidence offered by the Arms.

12. It should be noted that the actual trust settlor was not James J. Hill but Lake Superior Co., Ltd., a partnership of which James J. Hill was a founding partner. *In re Trust Known as Great Northern Iron Ore Properties,* 308 Minn. 221, 223, 243 N.W.2d 302, 304, certiorari denied sub nom. *Arms v. Watson,* 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

paragraph 17 is completely consistent with paragraph 9, which provides a discretionary power to convert trust properties to cash. We held that the extrinsic evidence now relied upon was inadmissible to contradict or vary the plain terms of these paragraphs and, even if considered, was incapable of establishing the settlor's alleged intent to deprive the reversioner of all interest in the trust. The trial court's reliance upon the same extrinsic evidence to insert into these paragraphs a duty to convert assets to cash is clearly inconsistent with this court's prior opinion. The unambiguous trust provisions themselves do not obligate the trustees to convert any trust assets to cash. Extrinsic evidence may not be used to contradict or alter the terms of an unambiguous trust instrument.[13]

### Practical construction

■ The trial court's instructions are based in part upon a determination that the trustees have in fact been distributing proceeds of land sales to certificate holders for 70 years. The parties have devoted a large share of their arguments before this court to disputing the evidentiary support of that determination by the trial court. Analyzing trust accounts through differing accounting theories, Burlington Northern argues that land sale proceeds have never been distributed to certificate holders, while the Arms assert that land proceeds have regularly been distributed out of the trust's commingled bank account.[14]

We find it unnecessary to decide whether or not land sale proceeds have in practice been distributed to certificate holders. If the trustees have never distributed land sale proceeds, that would not restrict their power to do so under trust paragraph 4. If the trustees have distributed land sale proceeds, that would prove no more than that the trustees have exercised the authority which is clearly granted to them in paragraph 4. Surely, prior distributions of relatively minor proceeds from land sales could not give rise to a *duty* to sell off all trust lands and distribute all proceeds to certificate holders in the future. Contrary to the Arms' suggestion, we find that no theory of estoppel could possibly apply to prevent Burlington Northern from contesting future liquidation of *all* reversion-bound lands simply because it may have acquiesced in some relatively small prior distributions.

The trial court's reliance upon inadmissible extrinsic evidence, inconclusive "practical construction," and an unwarranted reading of the trust instrument imposing a duty to liquidate all trust assets, in effect destroying the reversion, is erroneous. In our earlier opinion in this case, we recognized Burlington Northern's interest in the trust as reversioner, and we reversed the trial court's attempt to destroy the reversion by terminating the trust. Now the trial court has instructed the trustees that they have a duty to do, in effect, that which this court prevented the trial court from doing directly. The instruction to convert all trust assets to cash must be disapproved. It is not only erroneous and unsupported by the trust instrument or other evidence but also is inconsistent with this court's prior opinion.

### II. *Duties imposed by law.*

Burlington Northern relies upon the general common law of trusts and successive

**13.** 7A Dunnell, Dig. (3 ed.) §§ 3397, 3406, 3407; 19B Dunnell, Dig. (3 ed.) § 9888a, pp. 139, 148; *In re Declaration of Trust by Bush,* 249 Minn. 36, 81 N.W.2d 615, 82 N.W.2d 221 (1957). *Cf. In re Trusteeship under Agreement with Mayo,* 259 Minn. 91, 105 N.W.2d 900 (1960); *In re Trusteeship Created by Fiske,* 242 Minn. 452, 65 N.W.2d 906 (1954).

**14.** Based upon the trustees' reports for 1906 and 1924, and upon the annual reports since 1906, Burlington Northern has sought to demonstrate that total invested, undistributed trust receipts always exceeded receipts from land sales. Under the reversioner's theory of accounting, this signifies that none of the land sale proceeds were among the receipts distributed to certificate holders. The Arms analyze the trust accounts differently, characterizing the undistributed receipts as largely expended rather than invested. By this theory, the funds of receipts retained in investments would not exceed receipts from land sales so that land sale proceeds could be presumed among the funds distributed to certificate holders.

estates which would impose a duty on trustees to treat term and reversion interests impartially and to refrain from committing "waste" upon properties allocable to either interest. The Arms counter that the common law of trusts and estates is not applicable to a "business trust" of "wasting assets" such as they argue this trust to be. The Arms also argue that the trustees are legally obligated to liquidate trust assets before trust termination in order to maximize current income from a "business trust" and to prevent Burlington Northern from receiving lands which it allegedly is prohibited from holding by the Hepburn Act, Minnesota land laws since amended, and the Great Northern Railway charter through the Burlington Northern merger agreement.

We hold that the well-established common law of trusts and successive estates governs the exercise of the trustees' discretionary powers of sale and distribution in this trust. We find respondents' contrary arguments unpersuasive.

The Arms' first argument is that Great Northern Iron Ore Properties should be considered a "business trust" and, as such, exempted from duties imposed by the law of trusts and successive estates. This argument is not persuasive. We recognize that a commonly employed business form known as the common-law or Massachusetts business trust is governed by a special body of laws in some respects different from the common law of trusts,[15] however, it is not at all clear that the trust in this case is properly characterized as such a business

trust. Not every trust which conducts a business is a common-law or Massachusetts business trust. Bogert, Trusts and Trustees (Rev. 2 ed.) § 247, cl. B. This trust is like the common-law or Massachusetts business trust in that the income interest in the trust is owned by several thousand holders of transferable certificates of beneficial interest. Id. cl. A. However, unlike the business trust form, this trust was not created by a contractual arrangement combining capital contributions from the original certificate holders but rather by a gift from Lake Superior Co., Ltd., of property originally purchased with either the private funds of James J. Hill or the 1906 earned surplus account of Great Northern.[16] Unlike the business trust form, the original certificate holders here were not themselves the trust settlors.[17] Rather, as in the ordinary family trust, a trust settlor other than the appointed income beneficiaries has reserved a reversion to itself in the trust properties. The trustees here do not actively conduct a mining operation but, similar to any family trust, simply hold lands which they let under long-term royalty leases and collect the income for distribution to the certificate holders. The fact that this trust has been held taxable as an "association" under the Federal Internal Revenue Code [18] clearly does not control treatment of the trust under trust law. On balance, this trust seems to bear more of the characteristics of an ordinary trust conducting a business than of a common-law or Massachu-

---

15. See, e. g., Minn.St. c. 318; Bogert, Trusts and Trustees (Rev. 2 ed.) § 247; Restatement, Trusts 2d, § 1, comment *b*. Common-law or Massachusetts trusts are treated specially in some respects because of their similarity to the corporate form of business. For example, they may be exempted from the common-law rule against perpetuities (Minn.St. 318.02, subd. 3[1]); subjected to various corporate laws providing securities regulation or taxation as a corporation (Bogert, *supra*, § 247, cl. Q–U; *Morrissey v. Commr. of Int. Rev.,* 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 [1935]; Opinions Attorney General, No. 616d–17, March 2, 1961); or permitted liberal interpretation of the statement of powers and purposes in the trust instrument, like a corporate charter (*Bomeisler v. M. Jacobson & Sons Trust,* 118 F.2d 261, 265

[1 Cir.], certiorari denied, 314 U.S. 630, 62 S.Ct. 61, 86 L.Ed. 505 [1941]).

16. See, Bogert, *supra,* cl. B. We note that other courts have held that a business trust is not created where, as here, the entity arises by reason of a gift from a settlor who may retain a reversion rather than by a contractual relationship among capital contributors who themselves become the income beneficiaries. See, *Berry v. McCourt,* 1 Ohio App.2d 172, 204 N.E.2d 235 (1965).

17. See, Bogert, *supra,* cl. B; *Mayo v. Moritz,* 151 Mass. 481, 24 N.E. 1083 (1890).

18. *Reynolds v. Hill,* 184 F.2d 294 (8 Cir. 1950).

setts business trust. If the trust is not such a "business trust," it is unquestionably governed, in trust matters, by the common law of trusts and successive estates. Id. cl. B. But we need not finally decide the proper characterization of the trust to resolve the extent of the trustees' duties because it has been recognized that even a common-law or Massachusetts business trust, although governed by special corporate-like rules in certain respects, is subject to the underlying equitable and fiduciary duties toward trust beneficiaries imposed by the common law of trusts.[19] It may be true, as the Arms argue, that this fiduciary duty toward trust beneficiaries would impel the trustees to maximize cash proceeds during the trust term, even by liquidation of unmined lands, were the certificate holders the only trust beneficiaries as in the typical Massachusetts trust. But here, the certificate holders are not the only beneficiaries, and the law of trusts imposes a fiduciary duty to guard the interests of the trust reversioner as well as those of the certificate holders.

A second legal argument asserted by the Arms in an effort to exempt the trustees from any legal duties toward the trust reversioner is a reference to the law of wasting assets. The Arms, and the trial court by its incorporation of part of the Arms' trial brief into its memorandum of instructions to the trustees, have cited authorities recognizing that when an estate or trust consists of mining property, a wasting asset, the holder of the term interest does not commit waste by mining the property to gradual consumption or exhaustion during the term.[20] These cases, however, are not pertinent to the issue. The trustees' authority to exhaust minerals on the trust lands through ordinary mining operations during the trust term has not been questioned and must be recognized in furtherance of the purpose for which this trust was established. The authorities cited by the Arms, however, do not justify the sale of all trust lands containing more minerals than can be mined to exhaustion within the trust term. Such complete and deliberate liquidation of the entire reversion for the benefit of income beneficiaries cannot be allowed with impunity.

The Arms third argument is that the trustees are under no legal duty to the reversioner and indeed are obligated to liquidate the reversion because the Hepburn Act,[21] certain amended Minnesota land laws,[22] and limitations in the Great Northern Railway charter through the Burlington Northern merger agreement[23] allegedly make it illegal for the railroad to acquire and own mineral lands. Without reaching the legality or illegality of Burlington Northern's future fee ownership of trust lands, we hold that the legal proscriptions cited by the Arms do not invalidate the

19. Bogert, *supra*, cl. U; Annotation, 156 A.L.R. 28, 30; 13 Am.Jur.2d, Business Trusts, §§ 4, 61. The Arms rely upon three cases for their broad assertion that the "law of traditional 'successive estates' [and trusts] has no application" to a business trust. *Bomeisler v. M. Jacobson & Sons Trust, supra; Ashworth v. Hagan Estates Inc.,* 165 Va. 151, 181 S.E. 381 (1935); *Morrissey v. Commr. of Int. Rev. supra.* These cases do not support the Arms' broad assertion. They simply apply corporate laws to business trusts in particular limited areas. See, footnote 15, *supra.* The Arms do not and could not cite any authority which would exempt trustees of business trusts entirely from the fiduciary duties of the law of trusts.

20. See, e. g., *Minnesota Loan & Trust Co. v. Douglas,* 135 Minn. 413, 161 N.W. 158 (1917); *State v. Royal Mineral Assn.,* 132 Minn. 232, 156 N.W. 128 (1916); *State v. Evans,* 99 Minn. 220, 108 N.W. 958 (1906).

21. Since May 1, 1908, the commodities clause of the Hepburn Act 49 U.S.C.A., § 1(8), has prohibited a railroad from carrying ores from lands in which it owns any interest.

22. General L.1887, c. 204, § 3, made certain lands acquired by a railroad forfeitable to the state. This law was amended to remove that particular restriction by L.1945 c. 280 s. 1.

23. Fee ownership and operation of mining properties is alleged to be beyond the powers conferred by the corporate charter of Great Northern. In the merger agreement combining Great Northern with two other lines, the surviving corporation, now called Burlington Northern, was made "subject to all the restrictions, disabilities and duties, of the Constituent Corporations * * *."

reversion provided in the trust instrument. With regard to the Hepburn Act, we repeat our holding in the prior opinion in this case (308 Minn. 230, 243 N.W.2d 307):

" * * * Even if the carriage of the ore were held to be illegal, * * * it does not follow that this alone would render invalid what is an otherwise valid [reversionary] provision in this trust."

We extend our reasoning there to all of the other potential legal proscriptions against the railroad's owning mining lands invoked by the Arms. In fact, it is not clear that these legal proscriptions had any potential effect on the reversioner until 1913, when the railroad first acquired the settlor's reversionary interest. As stated in our prior opinion, " * * * [W]e are not prepared to say that this transfer 7 years [after creation of the trust] is controlling in ascertaining the intent of the grantor when this trust was drawn." 308 Minn. 229, 243 N.W.2d 307. Although courts will not actively enforce illegal contracts,[24] we do not have here a contract which was illegal at its inception but rather a validly created trust reversion. The trust properties must be allowed to pass under the trust instrument. The proper remedy for any claimed future illegality in Burlington Northern's acquisition of the trust lands would be an enforcement action under the Hepburn Act or Minn.St. 301.12 (ultra vires)[25] at that future time. None of the arguments advanced by the Arms exempts the trustees from their legal duties toward the trust reversioner according to the law of trusts and successive estates.

Having found that this trust is governed by the common law of trusts and successive estates, we turn now to examine what duties are imposed upon the trustees by that law.

It is fundamental trust law that trustees are under a legal duty to manage the trust "with equal consideration for the interests of all beneficiaries." Restatement, Trusts 2d, §§ 183, 232; Bogert, Trusts and Trustees (2 ed.) § 541 (1977 Supp.); II Scott, Trusts (3 ed.) § 183; III Scott, Trusts (3 ed.) § 232. We adopt and approve Restatement, Trusts 2d, §§ 183, 232 and comments, quoted in part below, as an accurate statement of the law in this jurisdiction.

"§ 183. Duty to Deal Impartially with Beneficiaries

"When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them.

\* \* \* \* \* \*

"§ 232. Impartiality between Successive Beneficiaries

"If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests.

"Comment:

\* \* \* \* \* \*

"*b. Duty to each of successive beneficiaries.* If by the terms of a trust the trustee is directed to pay the income to a beneficiary during a designated period and on the expiration of the period to pay the principal to another beneficiary, the trustee is under a duty to the former beneficiary to take care not merely to preserve the trust property but to make it productive so that a reasonable income will be available for him, and he is under a duty to the latter beneficiary to take care to preserve the trust property for him."

This court has long recognized that the equitable duty of impartiality governs exercise of trustees' powers in a trust such as this one. In *Congdon v. Congdon,* 160 Minn. 343, 376, 200 N.W. 76, 88 (1924), involving a trust of mining stock very similar to this trust at its creation, we said:

**24.** The Arms cite several cases to this effect in their brief. See, e. g., *Minter Brothers Co. v. Hochman,* 231 Minn. 156, 42 N.W.2d 562 (1950); *Kniefel v. Keller,* 207 Minn. 109, 290 N.W. 218 (1940); *Marshall v. Lovell,* 11 F.2d 632 (D.Minn.1926), affirmed, 19 F.2d 751 (8 Cir. 1927).

**25.** It should be noted that under Minn.St. 301.-12 acts or holdings which are ultra vires are not declared void but are only challengeable by aggrieved parties.

622

" * * * In short, it is the duty of the trustees to consult the interests of both life tenants and remaindermen impartially so as not to give either an advantage at the expense or to the prejudice of the other; and it is the duty of courts of equity to preserve the proper relation between capital and income, so that the integrity of the corpus of the trust may not be destroyed or impaired. The object of the rule is to secure a fair adjustment of the benefits of all the cestui que trustent in succession."

Since the trust instrument creates both term and reversionary interests, the law of trusts protects both interests against prejudicial exercise of powers granted in the instrument. Accordingly, the trustees are instructed that their authority to convert trust assets to cash may be exercised only when to do so will serve the interests of both the certificate holders and Burlington Northern. It may be noted finally that, if a need arises, the trustees may petition the district court for further instructions defining what is required to balance the equities of term and reversion with respect to any particular future decision in trust management.

The order of the district court instructing the trustees is reversed with directions to enter an order instructing the trustees in accordance with the views expressed herein.

Reversed.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.