In the Matter of the Trust Known as
**GREAT NORTHERN IRON ORE
PROPERTIES.**

No. C7–87–1492.

Court of Appeals of Minnesota.

Feb. 16, 1988.

Harry T. Neimeyer, Stringer, Courtney & Rohleder, St. Paul, for appellant GNI Certificate Holders Committee.

Sue Ann Nelson, Doherty, Rumble & Butler, St. Paul, for respondent Trustees.

Frank J. Hammond, Briggs & Morgan, St. Paul, for respondent Burlington Northern, Inc.

Heard, considered and decided by HUSPENI, P.J., and PARKER and LOMMEN,* JJ.

## OPINION

PARKER, Judge.

On April 1, 1987, the trustees of the Trust Known as Great Northern Iron Ore Properties (hereinafter the Trust) petitioned the district court for approval of their annual report to certificate holders for the calendar year 1986. A hearing was set for June 17, 1987. At the hearing the Trust certificate holders committee contested the report, particularly the $8,348,634 variously described as "working capital" or "reserves," and asked for an explanation of that figure.

The only witness at the hearing was Clifford Christiansen, vice president and secretary of the Trust. Christiansen was unable to explain the retention by the Trust of the amount of the working capital, except to state that this was a long-term practice and was due to uncertainties in maintaining the Trust properties. The report as submitted indicates a reserve retained over recent years in excess of $7 million. Christiansen stated that the reserve amount had not varied much in 30 years. The trial court indicated it was not satisfied with the explanation for the reserve amount and suggested the trustees submit a written explanation.

Following the hearing, the June 26, 1987, affidavit of Harry Holtz, president of the trustees, was submitted to the court. In the affidavit Holtz listed several "pertinent factors" taken into consideration by the trustees in arriving at the figure held in reserve. One of these factors was an

amount of $6,814,610 listed as "Reversioner's probable claim with respect to undistributed 'cost depletion' under the Internal Revenue Code."

On June 29, 1987, the trial court issued an order approving the report of the trustees. The committee filed a motion on July 15 requesting the court to amend the order or to grant a new hearing. The trial court denied the motion for amendment on September 9, 1987. On July 30, 1987, the committee filed an appeal of the June 29 order. We affirm.

## FACTS

The Trust was created in 1906 by agreement between Lake Superior Company, Ltd., and four individuals. The terms of the Trust made registered shareholders of the Great Northern Railway as of December 6, 1906, income beneficiaries. The shareholders' total interest was divided into 1,500,000 shares, and certificates were issued for each share. The Trust assets consist of mining properties. The terms of the Trust give the trustees the authority to manage the property and to buy and sell other property for the benefit of the Trust. The trustees are to distribute to certificate holders such portion of the net income from the property as they deem proper not less than once a year. The Trust is to stay in existence for the lifetimes of 18 individuals, to be terminated 20 years after the death of the last survivor. At that time, all cash assets are to be distributed to the certificate holders, and non-cash assets are to revert to Lake Superior Company or its assigns. Burlington Northern, Inc., and its subsidiary, Meridian Minerals Company, currently hold the reversionary interest. The Trust property has been leased to various mining companies, with the lease payments providing the bulk of the income.

In a series of actions, sometimes referred to as the "Arms litigation" after the names of two of the parties, the trustees petitioned the district court for instructions on their powers and duties to convert the trust

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

assets to cash. The district court found that the intent of the Trust had been satisfied and ordered the Trust terminated, with all assets, cash and otherwise, to be distributed to the certificate holders. The Minnesota Supreme Court reversed, finding the trial court erred in allowing extrinsic evidence, because the terms of the Trust were unambiguous, and remanded for a determination of the original question of the trustees' authority and responsibility to convert the Trust assets to cash. *In re Trust Known as Great Northern Iron Ore Properties*, 243 N.W.2d 302 (Minn.1976), *cert. denied sub nom. Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

On remand the trial court found the trustees had no responsibility to the reversioner and had the duty to convert the assets to cash for the certificate holders' benefit prior to the expiration of the Trust. This would, of course, result in the destruction of the reversionary interest. The Minnesota Supreme Court again reversed, finding that the trustees have a duty to protect both the income beneficiaries and the reversioner's interests equally. Trustees may convert assets to cash only when doing so will serve both interests. Decisions in managing the Trust are to be made balancing the respective interests. *In the Matter of the Trust Known as Great Northern Iron Ore Properties*, 263 N.W.2d 610, 621–22 (1978).

The Tax Reform Act of 1986 once again raised problems for the Trust. Prior to the Act, the Trust was taxed as a corporation, with the income being taxed in the hands of the Trust and again when distributed to the certificate holders. The Act gave the Trust the option of an election to avoid this double taxation. Under the election, the Trust assets would be considered immediately liquidated and taxed only to the certificate holders.

The trustees petitioned the district court for instructions. The certificate holders committee wanted the trustees to make the election, but reversioner Burlington Northern opposed the election, fearing exposure to confiscatory taxes. This fear stems from a belief that immediate disbursement would result in a depletion of funds to the extent that funds would be unavailable for other taxes or Trust expenses and a resulting loss of Trust property. The district court instructed the trustees not to make an election until proposed amendments to the Act are decided and further determination of the Act's effects can be made.

The next major activity in this case is the present controversy. The committee maintains that the trustees abused their discretion in withholding the reserve amount from distribution. The Trust certificate holders committee consists of 390 certificate holders controlling approximately 120,000 certificates. There are approximately 10,000 certificate holders controlling the 1,500,000 certificates. The committee maintains that no reserve or working capital is provided for in the terms of the Trust and the reserve should be distributed to the certificate holders. The trustees rely on Trust provisions giving the trustees discretion in distributing the Trust income and point to the unsure status of the mining industry as justification for maintaining the reserve. Burlington Northern maintains the necessity of the reserve to protect its interest from confiscatory tax and depletion of assets through other unmet liabilities.

The trustees also maintain that the issues raised by the committee are not properly before this court because they were not raised in the district court proceedings. They further claim that the committee's appeal is frivolous and request attorney's fees pursuant to Minn.Stat. § 549.21 (1986).

**ISSUES**

1. Were the issues on appeal sufficiently raised in the trial court to allow this court to review the trial court's decision?

2. Did the trustees abuse their discretion in maintaining the disputed amount in reserves?

3. Should attorney's fees be assessed against appellants?

## DISCUSSION

### I

The trustees claim that the issue of the $6,814,610 cost depletion allowance was not introduced and argued at trial and is therefore not properly raised on appeal. Although the specific issue was not argued extensively at the hearing, Christiansen stated during cross-examination that about $6 million of the working capital "is due to cost depletion, and that figure was never income to the trust but merely an expense that was taken to deplete the lands." In Holtz's affidavit, the cost depletion is specifically listed as one of the factors taken into consideration when the trustees determined the amount of the working capital. Because the court specifically requested "something in writing" and issued the ruling after receiving the affidavit, the working capital figure was a part of the court's decision. From these facts, we inferentially determine that the cost depletion figure was an issue at the trial level.

Additionally, the entire proceeding revolved around the working capital. The reserve figure was obviously an issue at the hearing, and the committee's entire cross-examination focused on this point. In requesting a clarification of this figure, all parts of it were brought into issue. Accordingly, a review of this issue is not beyond our scope of review as provided by law.

### II

Our decision on whether the trustees abused their discretion by retaining the cost depletion as part of the working capital involves consideration of several related factors.

First, we consider the terms of the Trust: After payment made of *or provision made for the expense of said trust,* the said trustees shall, from time to time, and at least once in every year, distribute and pay such portion of the net income or proceeds of the property held by them as such trustees, *as they may deem proper to be so distributed,* among and to the [certificate holders] * * *.

(Emphasis added). The salient items of this provision are emphasized. First, distribution is to be made after expenses have been paid or provided for; second, the distribution is to be made as the trustees deem proper. The trustees have a responsibility to protect equally the interests of the income beneficiaries and the reversioner, as established by earlier decisions in this matter. *In the Matter of the Trust Known as Great Northern Iron Ore Properties,* 263 N.W.2d at 621, 622.

The undetermined effects of the Tax Reform Act of 1986 have been raised as an issue. However, until the potential detriment or benefit to the certificate holders and the reversioner is finally determined, any claims of losses or gains by either are speculative. When the trustees sought court guidance in making the election, the committee itself suggested that a fund be established to meet Trust expenses should an election be made.

The uncertain state of the mining industry, a fact undisputed in the trial court, is also a consideration. Potential loss of mining leases may leave the Trust with insufficient liquid assets to meet expenses and require the sale of Trust property.

We also note the district court order of November 29, 1982, establishing an account to pay attorney's fees. Following the Arms litigation, in which the Minnesota Supreme Court awarded attorney's fees to be paid from the Trust principal, the district court ordered an account set aside in the Trust to meet future expenses of this type. The proper distribution of the assets of this account is to be determined as termination of the Trust nears. We are addressing an analogous situation here.

Finally, we consider state statutes, which provide that an injured party may bring an action against a life tenant for waste and may be awarded treble damages. Minn. Stat. § 561.17 (1986).

The result of these multiple considerations is that the trustees may disburse funds as they see fit and, at the same time, must protect themselves from actions for waste. All of this must be done in the uncertain atmosphere of the new tax laws

and the fluctuating mining economy. Absent a specific showing of abuse of discretion, which the committee has failed to show, we must agree with the trial court that we should not substitute judicial wisdom for business judgment.

## III

Although we find that the trial court's order must stand, we do not find assessment of attorney's fees warranted. Fees may be awarded when claims are frivolous or made in bad faith. Minn.Stat. § 549.21, subd. 2 (1986). We do not find the claims here to be frivolous, nor has there been a sufficient showing of bad faith.

## DECISION

The reserve fund established is not an abuse of discretion by the trustees, and the trial court properly allowed the accounts for fiscal year 1986.

Affirmed.